Chief Justice Marshall
delivered the opinion of the Court.
By an agreed case made in the Louisville Chancery Court, between Jackson, Owsley & Co. as plaintiffs, and the .¿Etna Insurance Company defendant, it appears that in 1850 the defendant issued a policy for one year, but annually renewed by payment of the premium, insuring Jackson, Owsley & Co. against loss or damage by fire, to the amount of five thous- and dollars on pork, lard, bacon, bulk meat, hogs hanging and otherways, salt, barrels, kegs, and all other articles composing the stock of a pork-house, contained in their pork-packing, lard, and smoke-houses, situated on the Bardstown turnpike, ■near the city of Louisville, with the privilege of ren-dering lard and smoking meat; also to affect additional insurance without further notice to that office, unless called for. But it was stipulated that if there were other insurance prior or subsequent, the insured, in case of loss or damage, should not recover of this company a greater portion of the loss or damage sustained than the amount hereby insured shall bear to the whole amount insured on said property. The third printed condition annexed to the policy provides that goods held in trust or on commission, are to be insured as such, otherwise the policy will not cover such property; and that in case of loss the names of the respective owners shall be set forth in the preliminary proofs, together with their respective interests therein; and that goods on storage must fee *255 separately and specifically insured. The fourth condition is to the effect that if a policy be assigned without consent of the company, the liability thereon shall cease. And that in case of any transfer or change of title in the property insured by this comnany, such insurance shall be void and cease.
The above mentioned policy was in force at the time of the fire, on the-- day of-■, 1853, when a large portion of the meat and other articles in the pork-house was destroyed. At the same time seven other policies were in force, of which four insured Jackson, Owsley & Co., to the amount of $5,-000 each; two insured Jackson, Owsley & Co., or whom it may concern, to the amount of $5,000 each, and one for $25,000 in substantially the same form. The sum covered by all of the policies together was $60,000. The description of the property insured by each was in substance the same. It appears, however, that a large part of the pork, &c., in the house belonged to others than Jackson, Owsley & Co., the proprietors of the house. That the total loss of these articles by the fire was about $56,500, of which property, to the value of $19,938 98, was claimed by the plaintiffs as theirs, and the other property lost amounted to $36,575 70. It appears, also, that a short time before the fire occurred, Jackson, Owsley & Co., had made a sale or an agreement for the sale of 40,-000 shoulders of meat in the pork-house, part of that now claimed as their own, to Harbison & liansboro, the terms and circumstances of which will be hereafter further noticed; and the defendants insist that the value of such part of these shoulders as was destroyed by the fire, amounting, as they claim, to about $13,000, should be deducted from the claim of the plaintiffs for their own property destroyed. The defendants further insist that they are liable for nothing more than a ratable proportion of the loss upon the specific and peculiar property of the plaintiffs, whose property alone they say they insured; that the loss for whieh they are ratably liable is to be ascer *256 tai.ned by first excluding from the estimate of the loss of the plaintiffs the value of the shoulders sold to H. & H. and destroyed by the fire, and then by applying to the residue of their claim for themselves, a rateable indemnity due from the three policies which insured Jackson, Owsley & Co., or whom it may concern, to the amount of $35,000, and that their liability is only for one-fifth of the remaining loss. The plaintiffs insist upon the opposite of each of these positions, and claim that in each of the eight policies, whether the words “or for whom it may concern,” be contained in it or not, the entire property comprising the stock of the pork-house, whether belonging strictly to themselves, or held by them for others, is covered to the aggregate value of $60,000, that the defendants are liable for the rateable proportion of the whole loss estimated upon this basis, or that if there be the difference contended for between the effect of the policies, with or without the words “or whom it may concern,” the five policies which do not contain those words should be applied without any aid from the others, to the peculiar loss of the plaintiffs, leaving the other policies to cover the remaining loss; and further, that notwithstanding the sale of the shoulders to H. & H., such interest, property, and risk remained in the plaintiffs, as that they continued to be covered and protected by the policy of the defendants, and by the other policies before referred to.
It will be seen from this statement, that the case presents two principle questions; the first upon the construction and effect of the policy on which the claim is founded; the second upon the effect of the sale to Harbison & Hansboro. Upon each of these questions, so far as extraneous facts might be applicable, there was a contest, and evidence was adduced by the parties; and the chancellor having decided the question upon the construction of the policy in favor of. the plaintiffs, and that upon the effect of the sale to Harbison & Hansboro in favor of the defend *257 -ants, and having decided against the latter, a sum ascertained on this basis, the defendants by their appeal, and the plaintiffs by cross errors complain— the former that the decree is for too great, and the latter that it is for too small a sum.
In reference to the first of these questions, it is proved that 'at all of the pork-houses in Louisville, and the adjacent cities of New Albany and Jeffersonville, eleven in number, and of which eight aré an Louisville, it is a large part of the regular business of the establishment to receive the hogs of other persons, to be slaughtered, cut up, packed or smoked, or ■otherwise disposed of, as may be directed 'or agreed on; and that a large, often, perhaps, the largest part of the meat contained in the pork-house belongs to other persons than the owners of the pork-house; and the evidence authorizes the assumption that in Louisville the term pork-house is understood to denote an establishment in which the slaughtering of hogs, belonging to various owners, and the preparation of the pork, and lard or bacon to be made from them, is carried on, and the custody and care of the whole is undertaken; and that the stock of a pork-house is understand as including the hogs and meat of the various owners placed and contained in it, as well as the instruments and materials necessary for carrying on the business in its various stages. The terms used in the policy to describe the different subjects of the insurance, are comprehensive enough to embrace all the subjects of the kind mentioned which might be contained in the pork packing, lard, and smoke-houses of the plaintiffs. And, although, if there were nothing to indicate a contrary intention, the insurance might, under the third condition attached to the policy, be restricted to such of the articles described as properly belonging to the insured themselves ; yet as the words “and all other articles comprising the stock of a pork-house,” refer gramaticaily and properly not only to salt, barrels, and kegs, but also to all of the articles previously enumerated, *258 (as pork, lard, áse., &cM) there would seem to be clear indication of intention to embrace in the description everything constituting the stock of a pork-house, which might be contained in the packing, lard, and smoke-houses referred to.
1. An agent or consignee, having the property of his principal in his possession, and responsible for it, may, and especially if he have an interest in it, though it be only for his commissions, insure. it in his own name, and in case of loss recover its full value — holding all beyond his own interest in trust for the own ers of the property. (Story on Agency, section 111; Hewitt, Allison 4* Co. vs. Franlclin Insurance Company, 3 B. Mon., 231; 1 Hall, 189.)
It is proved that persons sending their hogs to the pork-house of Jackson, Owsley & Co., to be slaughtered, &c., generally directed insurance to be made; that all the property in the establishment was considered to be at the risk of the plaintiffs-; that they generally made advances on, and had charges against it; that it was their object to keep it all insured, as is usual among those engaged in the same business, and that their clerk, who obtained this policy, intended to get insurance applicable to the property of others, as well as that of the plaintiffs, and so understood his own application and the policy issued by the defendants.
It seems to be the established law, that an agent or consignee, having the property of his principals in his possession, and responsible for it, may, and especially if he have an interest in it, though it be only for his commissions, insure it in his own name, and in case of loss recover its full value, holding all beyond his own interest in trust for the owners of the property. (Story on Agency, section 111; Hewitt, Allison Co., vs. Franklin Insurance Company, 3 B. Mon., 231; DeForest vs. Fulton Ins. Co., 1 Hall, 84.)
This principle is recognized by the third condition of the policy before us, which is relied on to exclude from the insurance all the property in the pork-house establishment, except that which properly belonged 1o the plaintiffs themselves. And the question is, what form-of expression should be deemed sufficient to comply with the requisition that goods held in trust or on commission must be insured as such, or will not be embraced in the policy? A general answer to this question is, that as the language of the policy in all its parts is framed by the insurer, and not by the insured, it is the duty of the former, when *259 fully apprised of the subject intended and expected to be insured, so to.frame the policy as to cover the intended subject, and, to furnish the expected indemnity against loss upon that subject. And if the description given by the applicant, though sufficient by its comprehensiveness to cover all the property of the kind, and in the situation described, and which it may be his right and interest to insure, may yet, by the usage of insurance, or by the effect of a condition annexed to the policy, be subject, for want of particular words, to a restriction by which a portion of the property may be excluded; good faith requires that the insurer shall apprize the applicant of the ambiguity or other defect, or by enquiry ascertain his real intention. The insurer has printed policies encumbered with numerous and complicated provisos and conditions, and is presumed not only to understand their meaning, but to know their intended effect upon the forms of expression to be used in the policy, and upon the consequent rights of the parties. The insured, unfamiliar with these particulars, if not wholly ignorant of them, relies upon the written terms of insurance adopted for the actual case, and confides, as he has a right to do, in the skill and good faith of the insurer, for making the insurance effectual under the conditions of the policy to cover the subjects known to be intended. And although the insured by accepting the policy takes it with the description, provisos, and conditions, which form a part of it, yet if he has himself acted in good faith, the considerations just adverted to require that the terms of the policy, both written and printed, should be construed liberally for his benefit, and so as to effectuate, as far as may reasonably be done, the indemnity which he justly expected.
2. Policies of msurasceshould be liberally construed to effectuate the intention of the assured.
Upon the question above stated, as to the form of expression necessary to effect an insurance upon goods held in trust or on consignment, several witnesses who had been engaged in the business of making insurance and issuing policies in Louisville, *260 as agents for different insurance companies, were examined on each side. Several testified, on the part of the plaintiffs, to the effect that the description of property insured, as constituting the stock of a pork-house, was sufficient to embrace the property constituting such stock, though it belonged to various persons ; and that the additional words “or whom it may concern” were, in their opinion, immaterial, and gave no additional or different effect to the policy. Several witnesses for the defendant considered those .words as material, and were of opinion that without these or other words indicating the ownership of others besides the insured, the policy would not embrace the property of others. Even these witnesses considered that the additional words “or whom it may concern,” would suffice to extend the insurance to property held in trust or on consignment, at least fin an insurance on stock of a pork-house; and we understand it to be proved that any of the insurers would insert these words simply upon request at the time of making up the policy, and without increase of the premiums ; and that upon the policies executed to Jackson, Owsley & Co., not containing those words, all except two had been settled according to the claim of the plaintiffs in this case.
This evidence does not, it is true, establish a uniform custom or usage in Louisville, for the adjustment of loss upon policies such as that now in question, nor even a uniform practice in adapting the ¡terms of the policy to the protection of the different owners of property under the care and custody of the proprietors of a pork-house; but it shows that while some, perhaps a majority, would deem it sufficient for this purpose to describe the property as constituting' the stock of a pork-house; others, who would deem it necessary to say nothing more, would still be content with the additional words “or whom it may concern,” following the name of the insured, and would themselves use these words as sufficient ¿to include in the indemnity the property of the vari *261 ous owners. None of them intimate that they would deem it necessary to use more than these latter words for the purpose. And as these words, which indicate “nothing more than that other persons besides those specially named as the insured, are or may be interested in the subject, and may be entitled to the benefit of the promised indemnity, would be used by the strictest constructionists among the insurers themselves, as a sufficient compliance with the requisition of the third condition of the policy; any other words or phrase, importing the same thing, must, in reason, be deemed equally a compliance with the same requisition.
The policy itself shows that pork, lard, &c., and the other articles enumerated in it, do compose a part of the stock of a pork-house; the enumeration and description are sufficient to embrace all articles of the kind referred to, whether belonging to the owners of the pork-house or to others, and do embrace all unless restricted by the third condition. But as the term ‘pork-house,’ as understood in Louisville, designates an establishment and a business, in which hogs of various owners are slaughtered and undergo various operations by which they are prepared for market; and as the stock of a pork-house, being composed of the same articles, in their various forms, includes the property of various owners, and as the phrase itself carries with it the idea of this various ownership, and clearly denotes it, we think the enumeration of the various articles which might compose the stock of a pork-house, with the additional characteristic that they do compose the stock of a pork-house belonging to the plaintiffs, denotes sufficiently, and as certainly as the words “or whom it may concern,” that others besides the insured themselves are interested in the property, and are intended to have the benefit of the insurance to the extent of their interests, and should therefore be deemed a compliance with the third condition.
*262 If it were admitted that the application to insure in the names of Jackson, Owsley & Co., pork, lard, &c., and all other articles composing the stock of a pork-house, contained in the buildings described, did not indicate unequivocally the desire to insure the entire stock of the pork-house to whomsoever the articles composing it might belong, it might well have been deemed sufficient for that purpose by the applicant, as it would have been, and in fact was so deemed by several insurers in Louisville. And with such knowledge of the business and usages of a pork-house as every insurer there must be presumed to have had, the application in these terms was at least sufficient to apprise any one applied to for insurance, that it was probably, if not certainly, the design of the applicant to obtain insurance upon the entire stock, though the articles composing it might belong to different owners. If, according to the opinions and practice or usage of the particular insurer to whom the application was made, a further specification of this intention were deemed necessary, good faith, as we have already said, required that he should have so informed the applicant, or that he should, by inquiry, (as one of the witnesses says would be proper,) have turned his attention to what was deemed an ambiguity, and have thus ascertained what he intended; having failed to do so, and having drawn up for an applicant who, as indicated by the terms of the application, intended to describe, and desired to insure the entire stock, a policy, which presenting the same ambiguity, (if it he one,) will be effectual or ineffectual for the purpose intended; as it may be construed in favor of one or the other parties, common justice requires that the consequences of the failure should fall upon the party who, under the circumstances, might and should have removed the ambiguity; and an applicant for insurance having indicated, with reasonable certainty, the extent of the insurance desired, should not, after a loss has occurred, be disappointed in his just expectation of in *263 demnity by an objection of which the insurer was apprised when the policy was issued, while its existance and effects may, for all that appears, have been unknown to the party insured.
3. A policy insuring all the articles constituting the stock of a pork-house, and all articles contained within the building described and appurtenant thereto, covers all within those buildings, without regard to the particular ownership of each or any article which was at the risk of the insured.
But the objection is not in any view sustainable. The object of the third condition of the policy, as shown by the practice of insurers at Louisville, is accomplished by any sufficient indication in the policy that the property described, to whomsoever belonging, is intended to be insured. And upon the evidence respecting the nature and business of a pork-house in Louisville, we are of opinion that the description of the subjects insured, as all being the articles constituting the stock of a pork-house, and contained in the buildings described, which are evidently appurtenant to the pork-house, is a reasonably certain indication that all articles of the kind mentioned and situated or contained in the buildings described, are, without regard to the actual or peculiar ownership of each or any of them intended to be insured. The hogs and meat in the establishment, and the ownership of them, would of course vary from time to time. At particular periods Jackson, Owsley & Co., the proprietors of the pork-house, might own none or but a small portion of the hogs or meat in it, but all being at their risk they had the strongest motives of duty and interest to keep it insured. And this fact, growing out of the nature of the business, tends strongly to prove not only that the plaintiffs intended to cover all by insurance, but that this intention was known to the insurers.
We are of opinion, therefore, that the first of the two questions stated was properly decided by the chancellor, and that the loss upon the articles constituting the stock of the pork-house should be borne ratably by all the insurers, although the articles did not all belong to Jackson, Owsley & Co., and although the policies do not all contain the words “or whom it may concern.”
*264 Upon the second question, which relates to the sale to Harbison & Hansboro, and its proper effect in this case, it is to be remarked, that although in strictness a sale imports a complete and executed contract, by which the title and possession, or right of possession are transferred from the vendor to the vendee, the term itself is often applied to transactions in which the transfer is not thus comprehensive and complete, and in which the contract, in some respects, seems to be executory. The criterion established for determining whether, in a particular case, the property has passed by the sale so as to be thenceforth at the risk of the vendee, refers of course to the particular facts which characterize the transaction. The facts in the present case are substantially the following: In February, 1853, some two or three weeks before the fire occurred, Harbison & Hansboro purchased from Jackson, Owsley & Co., 40,000 green or bulk shoulders of pork, on the terms that they were to be paid for in cash on delivery. On the same day of the purchase the vendors ascertained that they had not that number of shoulders in the condition called for by the contract, but having shoulders which had been hung up and were being smoked, it was agreed that the deficiency should be made up in shoulders of this latter description. The shoulders, all of which were in the pork-house buildings, were to be weighed by the vendors, and were to be sound and merchantable. The vendees were to employ an inspector to inspect them. The shoulders appear to have been weighed and inspected some ten or fifteen days before the fire. But it does not appear that either of the vendees, of whom both resided at the distance of about thirty miles, were at the pork-house, either at the time of the weighing or afterwards, before the fire, to receive and pay for the shoulders, though one of them had gone to- Louisville to see about it, and while there, probable about the time of the weighing, had advanced, by way of accommodation, and not of obligation, $17,000 to the *265 vendors; which sum did not equal one-half of the entire price to be paid. A very large proportion of the green shoulders was destroyed by the fire. The residue, together with those which were smoked, were afterwards delivered, and the price of those delivered amounting to about $3,000 in addition to the $17,000 previously advanced, was then paid.— The clerk of the vendors state that it was the general usage on such sales to make out an invoice, on the delivery of which to the vendees, the price was to be paid; that the meat until paid for was considered to be the property, and at the risk of the vendors, and we infer from the evidence that the parties understood that it was to be kept under insurance by the vendors. The invoice was made out on the meat being weighed, or as it was weighed sometime before the fire, but had not been delivered to the vendees, nor had any payment been made by them beyond the advance of $17,000 as before stated. The plaintiffs made no claim upon the vendees for the shoulders which were burnt, but look to the insurance upon the stock in the pork-house for indemnity.
The first question upon this evidence is whether the vendors had, on their part, done all that was to have been done preparatory to the final execution of the contract, and before the vendees were bound to pay for the articles purchased, since no invoice was ever delivered, and it does not appear that the inspector of the vendors had anything to do with the weighing or counting of the pieces or took any notice of either. Nor. indeed, is there any distinct and precise proof of the price per pound agreed to be paid, nor of the allowance to be made in taking the smoked instead of the green shoulders. If these matters remained to be adjusted before the aggregate sum to be paid could be certainly determined, it would seem that the articles sold did not, according to the general rule applicable to the ordinary sales of goods, for cash, to be paid for on delivery, become the property of the vendees, and at their risk, *266 before a large portion of them was destroyed by fire. And even if the matters just referred to were so agreed on in the contract that nothing remained to be done for their final ascertainment after the articles were counted, weighed, and inspected, it would be just and would seem to be requisite, that before the vendees should be involved in the hazard consequent upon ownership, they should be apprized of the facts necessary to be known before they could, by making payment, be entitled to assume the authority and control pertaining to ownership. This knowledge, according to the usage of the vendors in such sales, and the understanding of the parties in this particular case, was to be communicated by delivery of the invoice. And although the vendees might, at any time after the weighing, &c., was completed, which would necessarily take several days, have demanded the invoice, and upon that or such other knowledge as they had, might have offered payment and demanded or taken the goods, (as the vendors might on their part have delivered the invoice and demanded payment,) the delay of each party to exercise these rights important to each, if the ownership and risk were already devolved on the vendees, who had failed to insure, tends strongly to prove in corroboration of the statement of the witness, that it was the understanding and intention of the parties that the ownership and risk were to remain, and did remain, with the vendors, and under the protection of their insurance until payment or delivery. If, as we may think may be assumed, as fairly deducible from the facts, such was the intent of the contract, there is no doubt that such intention, whether expressed in words or implied from its nature and the attendant circumstances, would give character to the transaction and determine the rights of the parties. And there is as little doubt that the insurers, setting up this contract between the insured and others to protect themselves from loss, upon the very articles insured, occurring during the very period of their in *267 surance, must abide by the nature and effect of that contract as between the parties, to be determined upon the evidence in the case against the insurers.
4. Contracts are to be construed according to the intention of the parties thereto. A contract to sell 40,-000 hams, to be paid for on delivery; the hams were inspected and invoiced, but not delivered or paid for: held that the contract was ex-ecutory, and property not changed, and if insured protected by the policy. (Philips on Insurance, 1st vol., 27; 4 Massachusetts Reports, 336.)j
, There is no rule of law more universal or more inflexible that that contracts are to be effectuated according to the lawful intention of the parties. There is none more certain than that the parties themselves may determine by their contract, whether on a sale of property for cash on delivery, the title and ownership shall pass immediately on the making of the contract, or on the identification of the articles sold and the price, or not until payment or delivery. The contract in this case being in parol, is more open than if it had been in writing to implications, and to the proof of facts and circumstances, for ascertaining its terms and effect; and certainly there is no principle, either of reason or of law, which requires that in the present contest with the insurers there should be a different rule, either of evidence or of construction, from that which would prevail between the parties themselves. The insurers put their case and the question upon the right of the parties under the contract, and they must abide by those rights as they existed, and would be determined between the parties.
Then notwithstanding this nominal sale to Harbison & Hansboro, the plaintiffs, according to the view of the facts and law just presented, had not only the possession and the right of possession, but the property or ownership itself, in substantially the same plight as before, except that their obligation to deliver the articles to these purchasers on payment of the price, restricted them from selling the same articles to others. And as their interest in the safety of the property was equivalent to the entire price, (for under the view now taken, they were bound to account for the $17,000, and would lose the entire benfit of the sale, in case of non-delivery, unless they could show a default on the part of the vendees,) there seems to be no reason, according to the gen *268 eral law of insurance, why they should not recover for the loss of the articles counted and weighed under the contract, just as if the contract had not been made; nor is their right thus to recover affected, as we think, by the fourth condition of the policy, declaring that a transfer or change of title in the property insured shall avoid the insurance upon it. The only legitimate or supposable object of that clause is to prevent the continuance of the insurance, and the liability of the insurers, after the property ceases to be at the risk of the insured, when it would in effect be but a wagering policy. And notwithstanding the vagueness of the expression, “any change of title,” it would be understood by common men, and should be construed with reference to its object, as meaning such transfer or change of title from one to another, as would terminate the interest and risk of the insured in the property transferred.
5. A vendor of personal property, to be paid for on delivery, parts not with the title until payment; if the price is not paid in a reasonable time he may resume his original ownership, as upon a rescisión of the contract. (Story on Contracts, sec. 809; Chitty on Contracts, 427, and authorities there cited.)
But if the preceding view, with 'regard to the nature and effect of the contract, for the sale of 40,000 shoulders to Harbison & Hansboro be incorrect, if the right of property passed to them as soon as the shoulders were identified by counting and weighing them, the vendees were of course then bound to make payment, and the vendors had still not only the right to retain the possession until payment, but had also the farther right if payment should not be made in reasonable time, and especially after notice, to sell the same articles to another at the risk of the vendees, or to resume their own absolute dominion, as upon a rescisión or abandonment of the contract. (Story on Contracts, sections 809, 812; Chitty on Contracts, 427, and cases cited by both authors.) If these rights, which seem to be more than a mere lien, amounting in fact to nothing more, the lien did not like the right of the vendees to demand, and the obligation of the vendors to deliver possession in payment. of the price, grow out of the contract which conferred upon the vendors no other right but that of demanding payment. It grew out of their origi *269 nal ownership and dominion, and was a remnant of their original possession and property, or interest, precisely equal in value to the unpaid price to become due on delivery. And as this lien was retained as the chosen security, its value as property or as an interest in property is wholly independent of the solvency or insolvency of the debtor, and is precisely measured by the sum due, and the adequacy of the lien to secure it. The insolvency of the debtor would, it is true, render more apparent the importance of the lien as being the only security, but would not affect its intrinsic value, nor the creditors right to look to it for securing payment.
6. A vendor of goods not delivered, but to be paid for on delivery, has a lien on the property retained in possession for securing payment, and it is upon the presumption that the agreed price is the fair value, and cannot be enhanced by any fluctuation in the value; and if the goods be insured the vend- or is entitled to the insurance corresponding with interest insured. Any interest remaining in a vendor, who has made a contract of sale, remains protected under an existing insurance.— (8 Mass Reports 516; 5Pick., 76; 19 Lb , 81; Am. Lead. Cases, in note to the case in 8 Mass. Reports.
If no part of the price be paid this lien of the vendor, which is an interest or property in the articles sold, but retained in possession for securing payment, is upon the presumption that the agreed price is the fair value, to be regarded as equivalent in value to the articles themselves, and to the absolute ownership of them, except that although it may be depreciated it cannot be enhanced by the fluctuations of the market; and as the vendor, whether the vendee be solvent or insolvent, has a right to look to the goods and his lien upon them for securing payment, and is not bound to resort to the personal responsibility of the vendee, so if his lien or interest in the articles sold be pi’otected by insurance, that insurance being, in case of a destruction of the goods, and consequently of the lien, by a casualty insured against, substituted by the very nature and effect of the transaction, to the extent of the interest insured, in place of the goods themselves, he must have the same right to look to it, instead of resorting to the personal responsibility of the vendee, as he would have had to look to the goods themselves had they remained.
That the interest of the vendors, as above stated, was a proper subject of insurance, is not denied; and if they had insured that interest specifically, after the contract with Harbison & Hansboro, we suppose the consequence, as above stated, would be *270 alike unquestioned. But it is contended that without such subsequent and specific insurance the vendors, notwithstanding the previous insurance upon-the same articles as their property, have no recourse upon the policy on account of. the impairment or destruction of their lien by a casualty insured against, and that having lost their lien by the destruction of the goods, they have no other resource for payment but in the personal responsibility of the vendees, whose insolvency would subject them to precisely the same loss, and upon precisely the same subject, as if there had been no sale. And this consequence is insisted on in a case in which the very terms of the contract indicate clearly that there was no substantial transfer or change of the title, and that the vendors retaining, and entitled to retain, the goods as a security for the price, retain an interest in them equal to their value, and when the vendees at most acquire but a nominal title, unaccompanied by possession, or the right of possession, arising not from any positive act or intention of the parties having that object directly in view, but by mere operation of law, and encumbered by an interest of the vendors equivalent to the value of the subject, and clothed with the possession and the right of possession.
Waiving the objection founded on the inconvenience of requiring, and especially in the business of a pork-house, a new insurance after every transaction by which the title to property remaining in the establishment may be immediately or- ultimately affected, and waiving also the considerations which tend to show that the parties to this sale did not intend that the right of property should pass until payment of the price, but intended and expected it to remain as the property of the vendors, subject to the insurance already on it, we are of opinion that under the general law of insurance the interest remaining in the vendors after the sale, though-not the same as that which existed before, was still protected by the previous policy, unless excluded from pro *271 tection by the terms of that instrument; and that the fourth condition of the policy does not apply to a case in which, although there was in name a sale, there was in fact neither an absolute transfer of property or change of title, nor a substantial transfer or change of interest.
Upon the first branch of this proposition the authorities are abundant and decisive. Phillips, in his treatise on insurance, (volume \,page 27,) says it has been held “that the sale and conveyance in fee of a £ house insured, which the purchaser at the same ‘ time mortgages back to the vendor, did not divest ‘the assured of his interest under the policy.” In the case to which he refers (Stetson vs. Mass. Mutual Insurance Co., 4 Mass. Reports, 336,) the plaintiff, after the issuing of the policy, sold and conveyed a part of the building insured, reserving to himself a term of seven years in the premises, and the grantee at the same time reconveyed them to the grantor, in mortgage, to secure the purchase money; it was objected that by the act of incorporation, and by the very nature of a mutual insurance company, the members of the company must be the owners of buildings — it wms in virtue only of those buildings being insured that the owners can become members of the company. The objection seems to have been considered by the court principally with reference to. the principal of policy which prohibits gambling im surances, insurances without interest. The obj ection was overruled by a majority of the court, as not being supported by showing contracts affecting the formal title of the plaintiff, in part only of the subject of the insurance. And it is said in the opinion “his interest in a part remains the same, and perhaps substantially, and for the purpose of repelling this objection, is to be considered as unaltered in the whole of the premises insured. It had been before said, that taking the writings together, the transaction might be considered as a conditional sale after the expiration of. seven years.
*272 In Carroll, &c., vs. Boston M. Ins. Co., 8 Mass. R., 516, the principle seems to be recognized that if any interest remain in the insured at the time of the loss it is sufficient, and that if a conveyance made afterthe insurance, which was in fact absolute, had been a mortgage, there would still have been an interest on which there might have been a recovery. This principle is more distinctly stated in the case of Lazarus vs. Commonwealth Insurance Company, in which several cases in the Supreme Court of Massachusetts are referred to as sustaining it. (5 Pick. 76.) And in the same case again reported, (after a second trial,) in 18th Pick. 81, the principle was discussed and decided, that notwithstanding a conveyance, (after the insurance,) if it be in the nature of a mortgage or in trust, with a resulting trust to the insured, so that he has in truth an insurable interest in the property, he may nevertheless recover to the extent of his actual loss. The transfer of the vessel insured with other property, was in trust to pay over the proceeds to certain creditors of the plaintiff, who would of course be entitled to the surplus if any. A new trial was granted because a verdict had been found for the plaintiff, when there was no evidence of a probable surplus after payment of the debts. On the subsequent trial it was proved that the debts had been paid, and on the ground that the transfer was not absolute, and the insurable interest only conditionally affected by it, and that it left the plaintiff entitled to the surplus, the verdict for him was sustained, and he had judgment accordingly.
In the second volume of American Leading Cases, 435, in a note to the case of the Boston Mutual Insurance Company, before cited from 8th Massachusetts Reports, it is said to be universally admitted that a sale or assignment of the property will only defeat the recovery of the assignor on the policy, when and so far as it strips him of insurable interest, without regard to whether the interest which survives the conveyance be of the same nature or character as that which ex *273 isted before tbe conveyance was made, to which the author adds: “It is consequently well settled that a vendor either of real or personal property, who has retained the legal title as a security for the purchase money, may recover for a loss which has happened subsequently to the execution of the contract of sale,” and a number of cases decided by different courts are referred to. These cases, with few exceptions, we have not had an opportunity of examining. But the principle last stated is directly sustained by the case cited above from 4ih Massachusetts Reports, and the principle first stated is sustained by all of the above cited cases, to which others might be added.
The cases, and especially the cases in 4 Mass. R., and that in 5th and 19¿7¿ Pick., have also a bearing upon the construction of the fourth condition of the policy now in question, which being supposed to have been founded upon some just principle, and to have been intended for the attainment of some substantial object, and as a security to the insurer against unfair claims rather than as a protection against such as are just and equitable, we are of opinion that it does not apply to such contracts or transactions as affect merely the formal title of the assured, leaving in him an insurable interest of substantial value in the subject or apart of it, and especially where that interest is equivalent in value to that which existed before, and is only distinguishable from it by subtil and nice discrimination, or by artificial rules of construction.
Being of opinion, therefore, that under any view of the effect of the sale to Harbison & Hansboro, and of the transactions relating to it, the policy covered the interest of the plaintiffs in the articles sold, so long as they remained in the pork-house unpaid for, and not actually delivered; and being further satisfied that this interest of the plaintiffs was equal in value to the whole of said articles which were consumed by the fire, we conclude that the various insurers being, as now appears, responsible for the entire loss, the *274 defendants are responsible for one-twelfth part thereof.
Wherefore, the judgment upon the original errors assigned by the defendants is affirmed, but upon the cross errors of the plaintiffs it is reversed, and the cause is remanded, with directions to render a judgment in favor of the plaintiffs for one-twelfth part of the. entire loss, including that occasioned by the destruction of a part of the shoulders sold to Harbison & Hansboro.