CASE 34—PETITION ORDINARY—FEBRUARY 28.

# Brown & Long vs. Childs & Co.

### APPEAL FROM JEFFERSON CIRCUIT COURT.

B. & L. sold, on the 28th of June, 1,000 barrels of flour, which they then had in a warehouse separated from other flour, to C. & Co., without any stipulation as to the time of payment. The flour was to be delivered at the bakery of the vendees within eight or ten days, at any time they could use it within that period. On

the 1st July the flour was consumed by fire without having been delivered. *Held*—That the title to the flour did not pass; that it remained at the vendors' risk until delivered to the vendees at their bakery, and that the vendors could not recover the price.

G. A. & I. CALDWELL, for appellants, cited 1 *Parsons on Contr.*, 441; 6 *Dana*, 48; 7 *Dana*, 61; 1 *Duvall*, 183.

THO. W. GIBSON, for appellees, cited 1 *Parsons on Contr.*, 71; *Story on Agency*, pp. 11, 472, *and note;* 22 *Pick.*, 457; 6 *East.*, 614; *Hilliard on Sales*, 135; *Story on Sales*, 282; *Hill & Davis*, 414; 19 *Maine*, 147; 20 *Maine*, 325; 21 *Pick.*, 384; 4 *Seld.*, 291; 16 *B. Mon.*, 264.

W. F. BARRETT, on same side, cited *Smith's Merc. Law*, 481; 1 *Duvall*, 183.

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

This was a suit by appellants against appellees to recover for one thousand barrels of flour, at the rates of $7 45 per barrel, which had been destroyed by fire July 1st, 1864.

The law and facts were submitted to the court without the intervention of a jury.

After consideration, the judge dismissed the plaintiffs' petition at their cost, to reverse which this appeal is prosecuted.

It presents a question, often embarrassing, whether it was such a sale as vested the title in the appellees, and which party must suffer the loss.

The contract was through the agency of a broker on the part of appellants, and by parol, and is stated by him as follows: "That on 28th June, 1864, he sold, as a flour broker, to the defendants, one thousand barrels of flour, then in the warehouse of J. T. S. Brown, on the north side of Main street, between Eighth and Ninth streets, Louisville, marked Guy & Miller, at $7 45 per barrel. *There was nothing said at the time of sale about the time of payment.*"     *     *     "As a part of the contract, *I agreed to deliver, at the expense of the seller, the flour at the defendants' bakery on Guthrie street, perhaps three fourths of a mile from the warehouse; and I agreed to hold it for them eight or ten days, or as long as the storage lasted,*"     *     * "*to be delivered at any time they could use it during that period,*

stating that they had been buying a good deal of flour that day, and had not room for it at their bakery, *and I was to have the flour, or any part of it, hauled to defendants' bakery at any moment they might want it.*"

He stated further, " that he did not know at the time of the sale that plaintiffs were the owners of the flour. He had been authorized by Miller to sell it, and supposed it was his; and at the time of offering it for sale and selling it, he spoke of it as Miller's flour. Witness had never seen the flour."

Miller stated, " that on and prior to the 28th of June, 1864, to-wit: in April, 1864, the plaintiffs had, in the warehouse of Brown, on storage, on the north side of Main, between Eighth and Ninth streets, in Louisville, one thousand barrels of flour, which was in excellent order as to cooperage, and of full weight, and plaintiffs had no other flour in that house.

" The said 1,000 barrels were stacked away in a lot by itself, and not mixed with any other flour, and was marked Guy & Miller. Witness had sold the flour to plaintiffs in April, 1864, and well acquainted with it and with its condition and storage; that the plaintiffs, a few days before the 28th June, 1864, had requested him to sell said flour for them, and he, witness, had authorized Mr. Wm. Grubb, a flour broker, to sell it."

Mr. Smith testified that he was doing business, at and before the fire, in the warehouse of J. T. S. Brown, and that plaintiffs had, in said warehouse, just 1,000 barrels of flour, stored away in a pile by itself; that it was marked Guy & Miller, and was in excellent condition. That Miller first owned the flour and had sold it to Long, one of the plaintiffs, and that, a short while before the fire occurred, Long came to him and told him the flour was sold. He thinks this was about 20th June, some ten days before the fire; that the whole of the flour was destroyed by the fire. The fire occurred on July 1st, 1864.

Now, it is perceptible, from this statement of the evidence, that Grubb, the broker, did not know the flour belonged to the plaintiffs, and it may be presumed it was not expected he would receive the money. One thousand barrels of flour was to be delivered by the seller, at any time within eight or ten

days, at the defendant's bakery, some three fourths of a mile from Brown's warehouse; and nothing was said as to the payment of the money. He says nothing as to what passed at the time of the sale as to the quality or condition of the flour. That the flour was on storage with Brown per account of plaintiffs.

No order was given to Brown to deliver the flour to plaintiffs, nor, indeed, was it disclosed to him by Long, or any one else, that the flour had been sold to defendants; nor was there any delivery, symbolic or otherwise. Grubb says he considered it a cash sale; but this cannot alter the law of the case, for he had no right to consider anything extraneous to the terms agreed on; as to the construction of the contract, the law must consider and pronounce its effects. He says he saw Ring, with whom he had made the trade, the next day, and told him that the storage would run out on the 8th July, and if it remained there after that time, defendants would have to pay storage, and he replied, "Very well," and said he would be ready to use it before that time.

He also stated, that, in a day or two after the sale, he called on defendant, Ring, for the money (the price of the flour), and Ring replied that his partner had gone to Cincinnati, and would return in a day or two with the money, and that they would then pay for all the flour they had bought.

He further stated, that on the morning of the fire (July 1) he notified Mr. Pease, the agent of the defendants, of its destruction; and he said he was very sorry, for they were then just ready to commence using it.

It thus becomes apparent that defendants were, with all due diligence, getting ready to receive the flour, and were about ready to receive it when it was destroyed, only three days after the contract.

That neither party contemplated such a casualty, nor expressly contracted as to it, is most apparent.

A few general and elementary principles must determine the case; the difficulty is as to the proper application of these to the facts.

It is said by Story, in his work on Contracts (*sec.* 803, *p.* 877), that "When there is no agreement as to the time at which payment is to be made, the presumption is that *payment* and *delivery* are to be simultaneous."

Again, at section 834, page 914, he says: "When an examination of goods is, from their nature or situation at the time of sale, impracticable, a warranty will be implied that they are merchantable;" and he then gives various instances of impracticability.

At section 838, page 926, he says: "Under this head, also, arises the implied warranty in the sale of provisions, that they are sound and wholesome, on the ground that it is not only salutary, but necessary to the preservation of health and life. But this warranty is restricted to sales of provisions for domestic use and for immediate consumption.

The defendants desired to purchase flour for their bakery in Louisville, and this contract was to deliver them 1,000 barrels at their bakery, which they undertook to receive so soon as they could make room and be ready *to use it*. It may, therefore, be presumed as intended for that domestic market. The legal effect of this contract was, that plaintiffs undertook to deliver to them at their bakery 1,000 barrels of good, sound, merchantable flour, and the defendants undertook to pay them $7,450 when the flour should be delivered.

This contract involved not only counting, but cooperage; for, notwithstanding the broker informed them that 1,000 barrels of flour were in Brown's warehouse, he did not inform them that there was no other flour there, nor did defendants go to look at it; the place was of but little consequence to them, nor whether it was in a bulk to itself. They negotiated for 1,000 barrels, to be delivered at their own bakery, of Guy & Miller's brand.

It is apparent, from Miller's statement, that this flour had been piled up in April, when he sold it to plaintiffs, and that it was then in good order and of full weight; but no witness speaks of any subsequent unbulking, or inspection of any kind, to ascertain whether it was still in good order and unwasted; nor, indeed, could it be reasonably inferred that any

witness could know, without this, that each barrel was still in good order and condition.

Had this flour not been destroyed, and, on its delivery, it had been ascertained that any given number of barrels of the flour had been damaged, or had wasted, so as not to be of full weight, or the cooperage was so defective as it could not be delivered, is there any doubt as to the responsibility of the plaintiffs to supply the damaged flour, make up the deficient weight, or repair the cooperage? Without these, how could he deliver the 1,000 barrels at the defendant's bakery? Or should the flour become damaged, or wasted, on the transit from the warehouse to the bakery, is there any doubt that this would have been at plaintiffs' loss? And can there be any doubt but that plaintiffs could have supplied any deficiency by getting other flour of good quality of Guy & Miller's brand, though it might not have been in Brown's warehouse at the time of the contract? The proof is that it was worth ten cents per barrel to deliver this flour, or $100 for the 1,000 barrels.

The contract was, then, that plaintiffs would deliver to defendants at their bakery 1,000 barrels of flour for $7,450. The court is asked to adjudge that plaintiffs may be released from this obligation, and that defendants should be compelled to pay them $7,350, or to deduct $100, because of the non-delivery, thus altering the contract as to the delivery and amount to be paid.

Is there any law authorizing this arbitrary interference and alteration of the contract by the court?

It is laid down by Mr. Chitty (*see his work on Contracts, p. 374*), in general terms, "that *merely by the bargain* the property in the goods may be altered," and, in illustration of this general rule, he quotes:

"If one sell me his horse, or other thing, for money, or other valuable consideration, and, first, the same thing is to be delivered to me at a day certain, and, *by our agreement, a day is set for the payment of the money;* or second, all, or. third, *part of the money is paid in hand,* or fourth, *I give earnest money* (albeit it be but a penny) to the seller, or, lastly, I take the

thing bought, by agreement, into my possession, where no money is paid, earnest given, or day set for the payment; *in all these cases there is a good bargain and sale of the thing to alter the property thereof.*"

Now it will be observed, to comply with this rule it is essential *that a day be fixed for payment, or all or part of the money be paid, or earnest be given, or possession, by agreement, be delivered;* neither of which essentials attend this case.

Nothing was said, at the time of the contract, as to when the money should be paid; possession was not given; but the delivery was to be at any time within ten days, as might suit the purchaser, at his bakery; no money nor earnest was paid.

Again, at page 375, Mr. Chitty says: "Although a contract for the sale of goods be complete and binding in other respects, the *property in them* remains *in the vendor,* and they are at his risk, if any *material act* remains to be done before the delivery, either to distinguish the goods or ascertain the price thereof."

The cases on this subject may be divided into two classes: one, in which there has been a sale of goods and something remains to be done by the vendor, and until that is done the property does not pass to the vendee so as to entitle him to maintain trover.

The other class is where there is a bargain for a certain quantity, *ex* a greater quantity, and there is a power of selection in the vendor.

Now, in this case, the purchase was not of that particular bulk of 1,000 barrels of flour in Brown's warehouse; for, though the purchasers were informed the flour was in the warehouse, yet they contracted for the delivery at their bakery of 1,000 barrels of flour of Guy & Miller's brand, and were entitled to a delivery of 1,000 barrels of good, merchantable quality, in good order and condition, as to cooperage, and of full weight, no matter what may have been the condition of the flour then in Brown's warehouse; and, though it be established it was of the description, yet that does not alter the legal import of the contract; for defendants did not agree to take that particular bulk as it was; and

besides, the sellers, by the import of the contract, must take all the hazards of the transit from the warehouse to the bakery. If only one barrel of this bulk, on removal, should be ascertained to be damaged, or the cooperage bad, or the weight insufficient, this must be made up by the sellers, else a deduction made to the vendees. It was, therefore, impossible to comply with this contract without a count and delivery on the part of the vendors, and the ascertainment whether every barrel of that bulk of 1,000 barrels was in such condition as would answer this contract, and if not, to separate such as would from those that would not.

It was said by Mr. Story (*section* 801, *p.* 876) on Contracts: "But where the terms of a contract of sale shows an intention not to transfer the possession of property until after the performance of some act by the seller, *and especially where a future time of delivery is fixed, the title does not pass until such act be performed, or until the time fixed for delivery.*

"And although, where a specified chattel was sold for a fixed price, it being assumed to contain a certain quantity, *and the price was paid*, but, by the terms of the contract, the seller was to retain possession, *carry the chattel to a certain place*, there to deliver it at a certain time, and if, upon admeasurement, it was found to contain a larger quantity than what it had been assumed to contain, an additional price was to be paid, at a fixed rate, for the surplus, it was held, until measurement and *delivery*, the sale was incomplete, and the *loss* which occurred in the interim was to be *borne by the vendor.*"

Here was a specific chattel, assumed to contain a certain quantity, and the agreed price paid, with a contract that the seller was to retain possession, deliver the chattel at a certain place and time, and if, upon admeasurement, it was found to contain a surplus, this surplus was to be paid for at a fixed rate, the title did not pass because the seller retained possession until delivered at a future time and another place; and there was to be an additional sum paid to the seller if any surplus was ascertained. The ascertainment of this surplus was no more an additional act of the seller than the ascer-

tainment whether the entire 1;000 barrels of flour in Brown's warehouse was in proper condition to be delivered, according to the contract. But the important fact was the obligation of the vendors to deliver at a future time, and another place, and the retention of possession in the meantime. The vendors could have waived the admeasurement by relinquishing the right to any surplus, but they could release themselves from the obligation to deliver by performance only.

This flour being in Brown's warehouse on account of plaintiffs, he was their agent, and the possession continued with them, and in such cases Mr. Story says (*section* 805, *p.* 879): "It must, however, clearly appear, not only that the bargain is completed, but that the third person is not acting merely as the depository for the benefit of both parties to the contract;" because, if he still continues to act for the seller, there is no unequivocal change of possession. In this case, Brown was in no manner acting for defendants, because, according to the terms of the contract, they were not to have anything to do with the flour whilst it was in the warehouse; their possession was to begin on its delivery at their bakery. It is true, after the contract was made, Grubb, the broker, says he notified them that the storage would be out July 8th, and if it remained there longer they must pay the storage; but they said they would be ready to receive it before then.

Parsons, in his work on Contracts (*vol.* 1, *p.* 435), lays down the general rule thus:

"All that is essential to the sale of a chattel, at common law, is the agreement of the parties that the property in the subject-matter should pass from the vendor to the vendee for a consideration given, or promised to be given, by the vendee; yet where the parties have not explicitly manifested their meaning, the law makes some important inferences.

"There is a presumption that every sale is to be consummated at once; that the chattel is to be delivered and the price paid without delay. If, therefore, nothing appears but an offer and an acceptance, and the vendee goes his way without making payment, it is held to be a breach of the contract (which is presumed to have contemplated payment on

the spot), and the vendor is not bound by the sale. But if there was a delivery of the chattel, or the receipt of earnest, or of part payment, either of these is evidence of an understanding that something should remain to be performed *in futuro*, and the legal presumption is rebutted.

"Where the terms of the contract expressly postpone delivery or payment, or both, to a future day, here also the sale is valid, and no legal presumption obstructs the intention of the parties, but the property in the chattel sold passes immediately."

This is the general rule stated in very general language, and doubtless relates to that class of future delivery wherein the chattel is to be delivered at the place where it is at the making of the contract, and wherein there is nothing further for the seller to do, in which case his possession is for the purpose of a lien to secure the payment, unless he has agreed to deliver before the day of payment; for at page 449, the same author says:

"And generally, wherever, in a contract of sale, it is stated that some precise fact is to be done by either party, this may amount to a condition, though not so expressed. As where, in a contract for the sale of goods, the words are '*to be delivered on or before*' a certain day, *this is a condition precedent, and if they are not delivered on or before that day, the purchaser is not bound to take the goods.*

"So if the goods are to be delivered on request, the buyer must allege and prove a request, this being a condition precedent to his acquiring a complete right."

Again, at page 441, he says: "The property does not pass absolutely unless the sale be completed; and it is not completed *until the happening of any event expressly provided for*, or so long as any thing remains to be done to the thing sold to put it in a condition for sale, or to identify it or discriminate it from other things, or to determine its quantity, if the price depends on this, *unless it is to be done by the buyer alone.*"

Again, at page 446, he says: "If the contract be to deliver the thing ordered at the residence or place of business of the

buyer, the seller is liable, although such delivery becomes impossible, unless it becomes so through the act of the buyer."

The fact that there was but one thousand barrels of flour, in a pile to itself, in Brown's warehouse, belonging to plaintiffs, and that it was marked Guy & Miller, under the circumstances of this contract, is entitled to no very serious weight, at least not sufficiently so to change the legal effect of this contract.

1. Because said flour had been piled up there for more than two months, and no future examination made to see its condition, and, therefore, it must needs be examined as to its condition, weight, and cooperage, and if any was damaged, other flour put in its stead; if deficient in weight, this must be made up, and, if needs be, the cooperage repaired before delivery.

2. Because it is evident that defendants did not purchase that bulk of flour, but agreed for 1,000 barrels of Guy & Miller's brand, to be delivered at their bakery, although they were informed plaintiff had that amount and description of flour then in Brown's warehouse; and also, because the sellers must necessarily have a count before they could comply.

3. Because, as no time for payment was stipulated, the law presumes that the delivery and payment were to be concurrent acts, and both precedent conditions to the passing of the title.

This is a very different contract from the purchase of 1,000 barrels of flour, to be received at the place where the flour may be at the time of the contract, or the purchase of specific chattels, or a horse, to be received at the stable of the vendor, or the livery stable where the horse may then be, and the only future act, to entitle the purchaser to immediate possession, is to be done by himself, as the payment of the money, or giving a note.   In such cases the title passes, but the vendor has a lien for the purchase price, and holds the possession for the vendee, subject, however, to this lien, and, before the vendee can justly claim the possession, he must comply; and this is the distinction running through all the cases which we have

examined, decided by this court, ruling that the title was in the vendee, whilst the right of possession was in the vendor.

The case of Wills vs. Wills (6 *Dana*, 48), was where the parties exchanged a slave boy for a slave girl, both of tender age, and, for the purpose of rearing, both were to remain with their mother, and, whilst the title of each passed, the possession remained, for this purpose, as before the exchange. In the case of Crawford vs. Smith (7 *Dana*, 59), one party had sold his retail store to the other for cost, carriage, and seven and one half per cent. thereon, on a stipulated credit. The invoicing had begun, and some articles invoiced sold on account of the vendees, the vendor not objecting, but assenting by saying, in their presence, that he had no longer any right to sell them, but that his vendees might sell them if they chose to do so.

During the night, after the invoicing began, a thief stole part of the invoiced, also a part of the uninvoiced, goods. The court held, so far as invoiced and separated from the general stock, the title had passed, and the vendees must lose, but otherwise as to those not invoiced.

Sweeny vs. Owsley (14 *B. Mon.*, 413), was where a sale of a mule colt was made at a given price, five dollars paid by the vendee, with an agreement that the colt was to remain with its dam until weaning time. Held, that the remainder of the purchase price would be due on delivery, nothing being said as to the time of payment; and that, as the title passed, and the colt having died, the vendor was excused from the delivery, and was entitled to recover the remainder of the purchase price.

In this case a part of the money was paid, and an express contract that the vendor should keep the colt until weaning time, for vendee's benefit.

In the case of Duncan vs. Lewis (1 *Duvall*, 183), the rule in such cases is aptly and perspicuously stated by way of argument.

All these cases perfectly harmonize with the rule as quoted from Story, Chitty, and Parsons.

Ætna Insurance Company vs. Jackson, Owsley & Co. (16 *B. Mon.*, 265), involved the very question whether the property had passed to the purchasers; for, if so, the insurance company was not responsible, as the assured had parted with the title.

Harbison & Hansbroro had, some three weeks or more previous to the fire, purchased of Jackson, Owsley & Co., the insured, 40,000 shoulders of pork, to be paid for on delivery; the shoulders were to be weighed by the vendors; were to be sound- and merchantable; the vendees were to employ an inspector to inspect them. The shoulders were weighed and inspected some ten or fifteen days before the fire. One of the vendees, about the time of the weighing, had gone to Louisville to see about it; but no proof that he was at the pork-hose, where the shoulders were; and, about this time, had advanced, by way of accommodation, and not obligation, $17,000 to the vendors.

It was stated by the clerk to be the general usage on such sales to make out an invoice, on the delivery of which to the vendees, the price was to be paid. The invoice had been made out but not delivered to the vendees.

This case, certainly, strongly illustrates the rule that the vendors must do all they had undertaken, as precedent conditions, before the property passes. Here the number of shoulders were selected, separated, inspected, weighed, and the invoice made out, so that the exact price was ascertained, $17,000 advanced on the payment, and nothing remained to be done but to deliver the invoice and receive the remainder of the purchase price.

And the court expressly say the liability of the insurance company must be tested by the same rules that would apply if the suit had been between the vendors and vendees, and that if the vendors could recover the purchase price of the vendees, they could not recover of the insurance company, because they had parted with the title.

The court decided that the title did not pass, and held the insurance company responsible, because, they say, "it would be just and seem to be requisite that, before the vendees

should be involved in the hazard consequent upon ownership, they should be apprised of all the facts necessary to be known before they could, by making payment, be entitled to assume the authority and control pertaining to ownership. This knowledge, according to the usage of the vendors in such sales, and the understanding of the parties in this particular case, was to be communicated by delivery of the invoice."

If the simple delivery of the invoice, in the case just quoted from, was essential to apprise the vendees that the property was theirs and at their risk, that they might insure it if they desired, or remove it, how much more important, in the case under advisement, that the 1,000 barrels of flour should have been delivered at the place designated by the contract, to put plaintiffs in possession of the 1,000 barrels of such flour, and in the condition the contract imports.

In the case *supra*, the usage had to be resorted to for the purpose of ascertaining whether the vendors had done all they were required to do. In this case there is a *non-performance of the express contract* in a most material stipulation, and nothing in the case from which it appears that either party understood the title had passed, and, in the absence of such, the law does not pass the title, and the court below very properly dismissed the petition.

The Chief Justice and Judge Robertson concur in the affirmance of this judgment, on the ground, mainly, that the burnt flour was not identified by the contract, and the same never was in the possession or power of the vendees, at the place where it was when the contract was made, nor at any other place; and further than this they do not commit themselves.

Wherefore, the judgment is affirmed.