WILLIAM THWING *vs.* GREAT WESTERN INSURANCE COMPANY.

In a policy of insurance on a ship, a warranty "not to load more than her registered tonnage " with either or all of certain articles, including coal, applies only to articles laden as cargo; and is not broken by taking on board, besides that amount of the prohibited articles as cargo, a quantity of coal for dunnage, when a suitable material, actually and in good faith used, and no more than is reasonably necessary, for that purpose, even if freight is received for its carriage.

CONTRACT upon a policy of insurance issued by the defendants to the plaintiff October 6, 1863, on his ship Alhambra, for a voyage from Liverpool to San Francisco. Trial, and verdict for the plaintiff, in this court, before *Morton, J.*, who allowed a bill of exceptions substantially as follows :

" It was agreed that the vessel received injury, and that, if the defendants were liable, the case was to go to an assessor to determine the amount. The only question at issue, material to this bill of exceptions, was, whether the vessel was overloaded with coal, iron and bricks, under the following clause in the policy of insurance: ' Warranted not to load more than her registered tonnage, with lead, marble, coal, slate, copper ore, salt, stone, bricks, grain or iron, either or all, on any one passage, and not to carry guano or lime.'

" The defendants offered evidence tending to show that the vessel took on board at Liverpool, and carried to San Francisco, 1084 tons of iron, 6 tons of bricks, and 238 tons of cannel coal, making 1328 tons of prohibited articles, and that the registered tonnage of the vessel was 1270 tons.

" The plaintiff called as a witness the master of his ship, whose testimony tended to show that at Liverpool, on July 16, 1863, he made a written charter of this vessel to James Starkey, a copy of which was put into the case," and by which it was agreed " that (the cabin and stateroom, and sufficient room for the cables, ship's stores, coal not to exceed twelve tons, provisions, water, and crew, throughout this charter party being excepted, reserving, however, such room only for that purpose as the owners would, were the ship to be laden for their exclusive benefit, the charterers being allowed the full reach of the vessel's hold, including the half-deck) the said vessel shall immediately be made ready, and receive and take on board, from the said charterers, such goods as they may have to ship, or a full and complete cargo of lawful merchandise, specie, in dock and in the river, if required by the charterers, the owners employing sufficient hands for that purpose ; and, on receiving orders from the charterers, shall proceed to San Francisco, California, and there or so near thereto as she may safely get, deliver the said cargo in the usual and customary manner, agreeably to bills of lading, and so end the voyage. In consideration whereof, the said charterers shall deliver alongside the goods to be taken on board the said vessel, and shall and will pay for the use and hire of the said vessel, in respect of the said voyage, and in full of all freight, primage, pilotage, port charges, &c., at the rate of fifty-one shillings per ton (in full) of 2240 lbs. weight, cargo to be weighed on shipment."

" The master testified that, previously to making this charter party, he made another agreement (whether in writing or not he was uncertain) by which the charterer agreed to furnish dunnage for the ship, consisting of cannel coal to an amount not exceeding 250 tons, and pay freight therefor at the rate of fifty one shillings per ton ; that he fixed the rate of fifty-one shillings

per ton in the charter party, on account of this additional agreement; and that he would not have chartered his vessel at so low a rate if he was not to receive freight for his dunnage; that an assorted cargo like that furnished by the charterer required to be dunnaged in order to be properly stowed; that cannel coal is an article commonly used for that purpose; and that he took on board the 238 tons of said coal for the purpose of dunnage. He also stated, in cross-examination, that if this coal had not been furnished he should have bought planks for dunnage on ship's account, and sold them in San Francisco, or some other articles that would have paid a profit; that he received this coal for dunnage, and placed it along the bottom of the vessel; that it filled up the ship six feet and a half; and that upon the top of the coal he placed a flooring of five inch joist, and then placed the other cargo upon the top of this flooring. The master also stated that this coal was upon the freight-list; that he collected freight for it the same as for his other cargo; and that he signed a bill of lading for it, and he thought the bill of lading stated that it was shipped as dunnage. It appeared by the freight-list that this coal was shipped by James Dickson & Co.

" The plaintiff called various experts, whose testimony tended to show that cannel coal is often used for the dunnage of Liverpool cargoes, and is suitable for that purpose; that planks and old pieces of wood are also used, and are suitable for dunnage; that the purpose of dunnage of this kind, among other things, is, to raise the cargo out of the salt water, and leave a water-way underneath; that it is usually placed along the bottom of the vessel, from ten to fourteen inches in thickness; that cannel coal, used as dunnage, is liable to be injured; and that, when taken as cargo, it is usually stowed in the ends of the vessel, or, if it is stowed in the bottom of the vessel, it requires to be dunnaged. The plaintiff also recalled his master, who stated that, taking into consideration the shape of his vessel and the character of his cargo, six and a half feet of coal was not too much for dunnage, and, upon cross-examination stated that, in a previous voyage in this vessel from New York to Liverpool, he had used wood for dunnage, and had put in about fourteen inches.

" The defendants offered no further evidence, but requested the judge to instruct the jury as follows: 1. If they should find from the testimony that this coal was taken on board at Liverpool, for the purpose of being carried to San Francisco, it came within the warranty, and the verdict should be for the defendants. 2. Because a portion of the cargo paying freight was used as dunnage to the rest of the cargo, it was not therefore excepted out of the warranty, when, as in this case, it was coal. 3. If they should find, from the evidence, that planks or pieces of old wood were frequently used for dunnage and were suitable for that purpose, then it was a breach of the warranty to take coal in excess of the registered tonnage of the vessel on freight, although it was taken under an agreement with the freighter that it might be used for dunnage. 4. That, in order to find for the plaintiff, they must find that this coal was taken on board and used as dunnage, and did not form a portion of the cargo. 5. That, the defendants having shown that this coal was on the freight-list, and paid freight the same as other goods on board, and that a bill of lading was given, the burden of proof is on the plaintiff to show that it was not cargo.

" But the judge declined so to instruct the jury, except so far as is contained in the following instructions: That the mere fact that the plaintiff took on board a greater quantity of the prohibited articles than the registered tonnage did not necessarily work a breach of the warranty; but if the plaintiff had shown that cannel coal was a suitable material for dunnage, he vould have a right to use a proper and reasonable quantity for ᴜunnage; and, although the coal thus used caused the dead weight of prohibited articles to exceed the registered tonnage, it would not be a breach of the warranty; that in this case it was incumbent upon the plaintiff to prove three facts: first, that cannel coal was a suitable and proper article to be used for dunnage; second, that he actually and in good faith used it for dunnage; and third, that as much as fifty-eight tons was reasonably necessary to dunnage his ship; and that, if he had proved these facts to their satisfaction, there was no breach of the warranty." To the refusal of their prayer for instructions, and to the instructions given, the defendants took exceptions.

*B. R. Curtis & M. E. Ingalls*, for the defendants.

*S. Bartlett & D. Thaxter*, for the plaintiff.

GRAY, J.   The single question in this case arises upon this clause on the face of a policy of insurance upon the plaintiff's ship: " Warranted not to load more than her registered tonnage with lead, marble, coal, slate, copper ore, salt, stone, bricks, grain or iron, either or all, on any one passage." This clause is doubt-less a warranty, in the technical sense, any breach of which will defeat the policy ; and being a warranty, the meaning of the words used is to be ascertained, and, when ascertained, strictly carried out.

The subject of the insurance is shown by the policy itself to be a ship, intended to carry cargo, and, consequently, to be duly equipped and prepared for that object.   When a vessel is char-tered, the charterer usually covenants to load the cargo only, and the duty of furnishing ballast to keep the vessel in proper trim, and dunnage to protect the cargo from leakage, like that of providing necessary stores and equipments, and otherwise taking care that the ship is in proper condition and the cargo duly stowed, remains upon the owner of the ship. *Moorsom* v. *Page*, 4 Camp. 103. *Irving* v. *Clegg*, 1 Bing. N. C. 53 ; *S. C.* 4 Moore & Scott, 572.   Abbott on Shipping, (7th ed.) 346. *The Casco*, Daveis, 184, 192.   In *Towse* v. *Henderson*, 4 Exch. 890, it was held that the owner of a vessel, who had agreed to load for the charterer a full and complete cargo of teas, might take merchandise as ballast and receive freight therefor, provided it occupied no more room than other ballast would have done.

The " tonnage " of a vessel is her capacity to carry cargo ; and a charter of " the whole tonnage " of a ship transfers to the charterer only the space necessary for that purpose.   *Hooe* v. *Groverman*, 1 Cranch, 214, 236, 237.   *Ashburner* v. *Balchen*, 3 Selden, 262.   *Cuthbert* v. *Cumming*, 10 Exch. 809, 814.   The registered tonnage of a vessel, as regulated by act of congress, is intended as a safe standard of her capacity to carry cargo, and is usually less than her actual tonnage.

In the warranty in question, the words " not to load more than her registered tonnage " must have the same meaning and appli-

ration as if they had stood alone, and extended to all kinds of merchandise, instead of being restricted by the succeeding words to particular articles. They cannot, according to their obvious, strict and natural meaning, include things put on board as necessary parts of the ship's stores or provisions or equipment. They would not, for instance, apply to guns and ammunition for the defence of the vessel, nor to spare chains and anchors, nor to coal carried to be consumed on board, nor to salt or grain for provisions, according to the duties resting upon the owner by law and the rights reserved to him in the charter party. Nor do they include articles shipped for the purpose of serving as ballast or dunnage. If the warranty "not to load more than her registered tonnage" had extended to goods of every description, and the dunnage used had been of the ordinary kind — planks or pieces of wood placed against the sides and bottom of the hold, to receive, support and protect the cargo — it could hardly have been contended that their bulk or weight should be ascertained and computed in estimating the burden or tonnage of the vessel. The true meaning and whole effect of the warranty, in our opinion, are to forbid the loading of an amount greater than the prohibited articles as cargo in a ship properly fitted to receive it.

It was argued by the learned counsel for the defendants that an insurance on "cargo" would have covered the coal in question. But we are by no means sure that such would be the construction of such a policy. According to the definition of Postlethwaite, approved by this court in *Wolcott* v. *Eagle Insurance Co.* 4 Pick. 429, 433, "cargo" signifies "all the merchandise and effects which are laden on board a ship, exclusive of the soldiers, crew, rigging, ammunition, provisions, guns, &c., though all these things load it sometimes more than the merchandise." In that case, it was held that by the word "cargo" provender for cattle on board was not insured, because, said the court, "this was not laden on board as merchandise, and the circumstance that some of it might remain to be sold at the end of the voyage does not make it cargo." So it is doubtful, to say the least, whether "cargo" would cover the outfits of a

whaling voyage.  *Wolcott* v. *Eagle Insurance Co.* above cited. *Paddock* v. *Franklin Insurance Co.* 11 Pick. 227, 230.  *Hill* v. *Patten,* 8 East, 373, 375.

But if the word "cargo," in the description of the subject matter insured, could be held to include merchandise shipped as ballast or for dunnage, it would only be upon the rule of liberal construction, by which the general terms of a policy are interpreted, but which is never applied to a clause of warranty. A warranty cannot be extended by inference beyond the strict meaning of the words in which it is expressed. As was said by Chief Justice Shaw in *Forbush* v. *Western Massachusetts Insurance Co.* 4 Gray, 337, 341, " nothing is to be added by way of intendment or construction, when the words are clear and intelligible, although it may reasonably be inferred that some object was intended to be accomplished by the warranty, which a mere literal compliance would not fully reach." The chief justice there cited with approval a case in the queen's bench, in the time of Lord Mansfield, of a ship warranted to have twenty guns, and proved to have had twenty guns, but only twenty-five men, when it required sixty men to man twenty guns; and in which the underwriters contended that the warranty implied that there should be a proportionable number of men, but the court held otherwise.  *Hide* v. *Bruce,* 3 Doug. 213.  See also *McLoon* v. *Commercial Insurance Co.* 100 Mass. 472.

In the present case, there was evidence tending to show, and the jury have found by their verdict, that coal was a suitable and proper article to be used for dunnage, that it was actually and in good faith used by the plaintiff for dunnage, and that at least as much as the excess above the registered tonnage was reasonably necessary for the dunnage of this ship for her voyage.  The mere fact that a freight was paid upon the coal found to have been so used for dunnage is not necessarily inconsistent with and cannot control the finding of the jury.  Upon that finding, we concur with the justice who presided at the trial that there was no breach of the warranty.  We are fortified in this conclusion by a judgment rendered in the circuit court of the United

States for this district, in a similar case between the same parties. while this case has been under advisement.

*Exceptions overruled.*