Johnson, J.
To determine whether there is error in this case, two points are presented for consideration :
1st. Was the policy cancelled by the mutual consent of the parties prior to the total loss? This is to be determined by the evidence in the case.
2d. Did the trip up White River avoid the policy ? This is a question of law, to be settled by a construction of the terms of the policy.
1st. As to cancellation. The proof shows, that at the time the policy was issued a negotiable promissory note was given for $390 (the premium agreed to be paid), payable in six months from date, no part of which was ever paid by the insured. At the time of the alleged cancellation, November 20th, 1867, the company, without plaintiff’s knowledge, indorsed thereon a credit of $243.75, being the premium to be returned for the unexpirecl term, and declared the risk at an end. At that time this note was not yet due, and no demand was ever made for payment at or after maturity.
On the 9th of April, 1868, the note was placed in the hands of the attorneys for the company, and was by them sent to attorneys in Memphis, where the maker lived, for collection, where it seems to have been lost.
After the partial loss, which happened in October, 1867, was adjusted, Pyne, desiring to continue the several policies *328 on liis boat (there were eight in all in different companies), for the original amounts before the fire, engaged one A. W. Howe, an insurance broker in St..Louis, who, he says, represented himself as the agent of the defendant, and other insurance companies, to effect that purpose. Howe wanted him to increase the amount, in proportion to the new valuation of the boat resulting from the repairs, which he refused.
Pyne testifies that this was the extent of his authority, and that he never authorized Howe to have this policy can-celled; nor did he know, until after the boat was burned, of the claim now made that it was canceled, and that upon hearing of this claim he ivas greatly surprised. From all the evidence, it is clear that Pyne had no knowledge of the claim that the policy had been canceled, neither from the company nor from Howe.
He supposed he was insured up to the time and after the total loss. Only eleven days before such loss he applied, through Howe, to assign this policy to one John M. Henry.
He resided at Memphis, and the letters addressed to him at St. Louis did not reach him.
A. W. Howe testifies that he resided at St. Louis, and was an insurance agent in 1867 and 1868; that he knew Captain Pyne, who had a general average loss on his boat in process of adjustment; that “he was without insurance for whatever amount it might be.” “ He (Pyne) requested me to fix his up insurance so that he would be covered to the original amount. 1 advised him, I think, that as the amount of loss was not yet adjusted, to have the old policies canceled and take out new ones for one year, in the same companies for the original amount.” He said I should do as I thought best. I endeavored to do this, and sent a policy to the Tobacco Insurance Company, with instructions to cancel it and make out a new one from that date. Howe’s letter for that purpose is as follows:
*329 “ St. Louis, November 20,1867.
“ Secretary Tobacco Fire and Marine Ins. Co., Cincinnati.
“Dear Sir: Please consider your policy No. 39, $3,000, M. Pyne, on ‘ St. Patrick,’ as canceled from, the 18th inst., and make new policy for $3,000 from that date for one year, at same rate, 13 per cent., valuation $33,750 (fixed by our inspector), limit $22,500, balance same as old policy, with privilege of Mississippi River added. Please send policy and premium note, and I will collect amount due and remit at once. Yours truly,
“ A. "W. Howe, Clerk.”
To which the company replied:
“ Cincinnati, November 24,1867.
“ Mr. A. W. Howe, St. Louis, Mo.
Dear Sir: Your favor of the 20th inst. at hand. I can not agree to.the proposed change in policy on steamer 4 St. Patrick,’ and therefore cancel pro’ rata, charging for four and one half months. Returned premium $243.75.
“Tours very truly, Sam’l. L. Tourtee, Sec’y.”
At the same time Howe was in correspondence with the Boatman’s Insurance Company, which also held a risk on this boat for the same object, and in answer to one from its secretary, Glassford, he writes :
“ St. Louis, November 25,1867.
“ IT. A. Glassford, Esq., Secretary.
“Dear Sir: Your favor of 22d inst. is at hand — all right — please consider your policy good for the original amount, and notify the other companies to that effect. I append a list of the companies in interest. I think I shall be able to send the exact amount to-morrow, when I will write further particulars. Yours truly,
“ A. W. Howe, Clerk.”
The list “appended” contained the names of all the Cincinnati companies that had issued policies on the boat, including defendant, and in compliance with Howe’s request, Glassford did cause the notice to be given .to the different companies, and the defendant refused to assent, saying that they had no risk on the boat, the policy was canceled.
*330 Howe further testifies that he had authority to make any arrangement that he was a mind to, by which wTe understand any arrangement he was a mind to accomplish the object in view; that he never considered the policy canceled, and, to the best of his knowledge, Pyne did not, and that the object of his letter of November 20th “ was to keep the boat insured” and not to cancel the insurance.
It was admitted that the policy was never in fact returned to defendant, nor actually canceled.
Prom the evidence and correspondence, a majority of the court are clearly of the opinion that the allegation of the answer, that the policy was canceled by consent of both parties, at the request of the holder, is not sustained.
On the contrary, it is susceptible of demonstration, that Capt. Pyne intended exactly the reverse of a cancellation, that he did not know of the alleged cancellation until after the fire, and that neither himself nor Mr. Howe, if we regard him as Pyne’s agent, ever sought or desired such action. Not only is this true, but it is equally clear that Howe’s letter of November 20th, which is relied on as authorizing the company to cancel,so far from being authority for such action, was a plain and unmistakable expression of intent to the contrary, when read in the light of the circumstances under which it was written, and which were known to the insurer. I refer to the fact that there has been a partial loss not yet paid, that the boats’ value had been increased by the repairs, and that the policy was impaired by the partial loss.
When the insurance was effected in July previous, the boat was valued at $30,000, and it was insured in this and other companies for $22,500 for a full year, thus plainly indicating tne owner’s intention to keep it insured for that term, only five months of which had expired. He had in October sustained a partial loss, which was in process of adjustment, and had repaired his boat so as to increase its value to $33,500.
To the extent of this partial loss, his policies were impaired, and he was without insurance.
*331 He desired to restore them to the original amount, and for that single purpose, he authorized Howe, who was an insurance agent, to act for him. Howe suggested the best way to do this, as the partial loss was not yet adjusted, and therefore the extent to which his insurance was impaired was unknown, was to cancel the old policies and take out new ones for the original amounts for a full year from that date. To this Pyne assented, and authorized Howe to use his own judgment as to the mode of carrying out his wishes.
Howe had no authority to cancel these policies and leave Pyne uninsured, nor did he attempt to do so. Pyne spoke to Howe to fix up his insurance, not this policy only, but all he had, so that he would be covered by the original amount. Howe says he attempted to do this,,and thinking that the best way was to cancel the old policies and take out new ones for the original amount for a year from that date, wrote this letter of November 20 : “ Please consider your policy canceled from the 18th inst., and make a neto policy for $3,000 from that date for one year at same rate, 13 per cent., valuation $33,750 (fixed by our inspector), limit $22,500, balance same as old policy, with privilege of Mississippi River added. Please send premium note, and 1 will collect amount due and remit at once.”
This was an application for additional insurance on terms slightly different, and not to cancel the amount he already held. There is no mistaking the intention of the writer. The defendant knew the existing policy had been impaired by the partial loss in October not yet adjusted, and was advised by this letter of the increased value of the boat by-reason of the repairs.
The company are asked “to make a new policy for $3,000” for one year and cancel the old, and to send the new policy and premium note to Howe for collection. Can this be treated as authorizing the company to cancel and leave the boat to that extent uninsured ? He wanted a new policy for the original amount with increased'time and privileges *332 on the Mississippi river, offering to pay the additional premium.
It was optional with the company to comply with or decline this request.
The application was to cancel the old policy and make a new, and did not warrant a cancellation without at the same time complying with the request as an entirety. If we, as we may properly, regard it as a proposition to change and enlarge the existing contract between them, it must be accepted or rejected as a whole. Any modified or qualified acceptance was not binding on Pyne, unless he assented to the same. Parsons on Mer. Law, ch. 11 sec. 11; Chitty on Contr. 11-20.
The insured wanted a new policy, with increased insurance and enlarged permission, and desired to obtain that end by canceling the old policy and issuing a new. That was only a mode of accomplishing the desired end. The intention unequivocally expressed was for more insurance. This did not authorize the defendant to cut off all insurance.
Again, the policy provides, “ that in case of return premiums, at the request of insured, . . the earned time to be charged for at short rates.”
Here was no request for a return premium, but a distinct application for increased insurance, with a request to send premium note for the amount, and he would collect, and yet this is interpreted directly contrary to its plain language, and expressed intention of Pyne and Howe, as a request to return the premium; and they accordingly' and without any request of the insured calculate the earned time “ at short rates” and credit on the premium note!
That the company did not understand this letter of the 20th of November as a request or authority to cancel is clear from its answer of the 24th as well as one to Captain Pyne on the 22d, directed to him at St. Louis, but which lie never received, his address being Memphis.
In these letters of November 22d and 24th, the company construes this letter of Howe of the 20th as a “ proposed change” and not as a request to cancel. They say: “ I have *333 been adcRessecl by Mr. A. W. Howe, requesting me to cancel our policy No. 39 . . and issue a new policy with different conditions. The latter I do not feel free to do, and have therefore canceled your policy pro rata.” Again, in tlieir letter of the 24th to Howe, it is said: “Tour favor of the 20th is at hand. I can not agree to the proposed change, and therefore cancel.” They cancel, not because they have been requested to do so, but because they do not feel free to issue the new policy “ with different conditions.” The company might well refuse to issue a new policy, “ with different conditions,” but the fact that such a request was made, gave them no authority to cancel an existing contract, without the assent of the insured, and directly contrary to the expressed wish for more insurance.
The company bases their right to cancel on the fact that they can not agree “ to the proposed change, and therefore cancel,” and not upon any request to do so. It is said, that Howe received this letter of the 24th of November,- notifying him, that they could not agree to the proposed change, and had therefore canceled the policy, and did not dissent, and that if he had not intended that the policy should be canceled, he would have so notified the defendant.
To this it may be said: First, that before that letter could have reached him, he had already written Glassford to notify defendant “to consider the policy good for the original amount,” a most unequivocal declaration that he did not intend a cancellation. This notice was received by defendant, by which they were advised there was no cancellation by mutual consent. Second: Howe’s proposition was, to effect more insurance by canceling the old policy, and issuing a new one,' and must be accepted or rejected' as a whole. It was not accepted, and because it was declined, therefore it was cancelled. Howe might well disregard this unauthorized act, and treat the policy as subsisting. This is in fact what he did do.
The company seemed to have acted on the theory that the proposal for “ a new policy with different conditions,” which could not be granted, authorized it to break the ex *334 isting contract, and so punish the applicant for his temerity in making the request. To make this cancellation binding on the insured, as it was unauthorized, the burden rested on the defendant to prove that Pyne subsequently was advised of it and assented. This they have failed to do. The fact was distinctly otherwise.
Much more might be added, but as the general term of the court below laid no stress on this claim of cancellation, but affirmed the judgment on other grounds, we deem it unnecessary to discuss the evidence in detail, although much of the argument is devoted to this claim. It is sufficient to say that the letter of Howe furnished no authority to cancel. This is too clear for dispute, when all the facts are weighed.
2. Was the trip up the White River such a deviation or breach of warranty as rendered the policy void, so that no recovery can be had for a subsequent loss within the life of the policy, when such loss was not caused or contributed to by such trip ?
The insurers claim that it was.
They point to the words found among the stipulations of the underwriter, “with permission to navigate the Ohio and Mississippi Rivers below Cairo,” and to those found under the head of “Warranted by the assured,” “that the said vessel shall be run and navigated on the aforesaid privileged waters, as is usual for boat's of her class,” and claim that these provisions amount to a warranty by the insured, that he will not take the boat out of the permitted waters, the legal effect of which is to avoid the policy in case of a deviation.
On the other hand it is claimed that no such- warranty exists-. It is admitted that if the loss had occurred while the boat was navigating other than the permitted rivers, nc recovery could be had, but that on her return in safety to those rivers the boat was covered by the insurance, and that for any subsequent loss by fire the plaintiff may recover.
To determine this issue of law we must examine this con *335 tract by the light of those principles of construction that govern in such cases.
Among these are the following well settled rules : “As a contract of indemnity to the assured, the policy is to be liberally construed in his favor, not only because this mode of construction is most conducive to the interests of commerce, but because, for the reasons that have been stated, it is probably most consonant to the intentions of the parties. It is certain that the assured desires as ample an indemnity as he can obtain, and it is probable that the insurer means that he shall understand the indemnity given to be as extensive as its terms, upon any fair interpretation, import.” 1 Duer on Ins., sec. 5, p. 161.
“ When statements and engagements on the part of the insured are inserted or referred to in the policy itself, it often becomes difficult to determine to which class they belong. If they appear in the face of the policy they do not necessarily become warranties. Their character will depend upon 'the form of expression used, the apparent purpose of the intention, and sometimes upon the connection or relation to other parts of the instrument.” Campbell v. The New Eng. Mutual Life Ins. Co., 98 Mass. 391.
In the same case it is said: “ In considering the question whether a statement forming a part .of the contract is a warranty, it must be borne in mind, as an established maxim that warranties are not to be created nor extended, by construction ; they must arise, if at all, from the fair interpretation and clear intendment of the words used by the parties.” 98 Mass. 391.
“ A warranty can not be extended by inference beyond the strict meaning of the words in which it is expressed. As was said by Chief Justice Shaw, in Forbush v. Western Massachusetts Ins. Co., 4 Gray, 337, 341, ‘ nothing is to be added by way of intendment or construction, when the words are clear and intelligible, although it may reasonably be inferred that some object was intended to be accomplished by the warranty, which a mere literal compliance would not fully reach.’ The chief justice there cited with *336 approval a case in the queen’s bench, in the time of Lord Mansfield, of a ship warranted to have twenty guns, and proved to have had twenty guns but only twenty-five men, when it required sixty men to man twenty guns; and in which the underwriters contended that the warranty implied that there should be a proportionable number of men, but the court held otherwise.” Thwing v. Great West. Ins. Co., 103 Mass. 401.
“ Courts are not disposed to favor warranties by construction, and if the terms used are fully satisfied as a description, they will not be extended to include a warranty, unless it is clearly expressed that such was the design and meaning of the parties. These views are sustained by authorities entitled to great consideration.” United States F. & M. Ins. Co. of B. v. Kimberly, 34 Maryland, 231, 232.
In Yeadon v. Fry, Chief Justice Marshall says: “The counsel has considered the exception as a warranty; but the court can not so consider it. The words are the words of the insurer, not of the insured, and they take a particular risk out of the ■ policy, which, but for the exception, would be comprehended in the contract.- . . . Policies of insurance are generally the most informal instruments which are brought into courts of justice, and there are no instruments that are more liberally construed in order to effect the real intention of the parties if that intention can be clearly ascertained.”
“ All the conditions and terms of the policy, both written and printed, should be construed liberally for'his benefit” (the assured’s), “ and so as to effectuate, as far as may reasonably be done, the indemnity which he justly expected.” Etna Ins. Co. v. Jackson, 16 B. Mon. 258, 259.
“ Conditions subsequent are not favored in law, are not to be raised readily by inference or argument, and only when apt and sufficient words are used for that purpose.” Laberee v. Carleton, 53 Maine, 212, 213.
“ Such a condition, when relied on to work a forfeiture, is to be construed with great strictness; the demandant *337 shall have his exact legal right, but no more.” Merrifield v. Cobleigh, 4 Cush. 184.
“ The same rules of construction which apply to all other-instruments apply equally to policies of insurance — namely,, that they are to be construed according to their sense and meaning as collected from the terms used, which terms are-to be understood in their ordinary and popular sense, unless they have generally, in respect to the subject-matter,, as by the known usages of trade, or the like, acquired a peculiar sense distinct from the popular sense of the same-words, or unless the context points out that' they must, in the particular instance, and in order to effectuate the immediate intention of tlje parties to the contract, be understood in some special and peculiar sense.” Robertson v. French, 4 East, 130; Howe v. Mat. Safety Ins. Co., 1 Sandf. 151; Palmer v. Warren Ins. Co., 1 Story, 365; 1 Parsons-on Marine Ins., chap. 4, see. 9.
The policy commences with this stipulation :
“ This policy of insurance witnesseth, that the Tobacco-Eire and Marine Insurance Company of Cincinnati, by these presents, do cause M. Pyne to be insured in the sum of not exceeding three thousand dollars, lost or not lost,., upon the steamer' St. Patrick, wherever she is in safety at-noon of the 3d day of July, 1867, and from thence to noon of the 3d day of July, 1868, when this policy shall expire,. unless sooner terminated or made void by conditions hereinafter expressed.
“ With permission to navigate the Ohio and Mississippi river below Cairo, Ill. Coal oil clause waived.”
It is to continue until July 3, 1868, “unless sooner terminated or made void, by conditions hereinafter expressed.” By its terms it is to remain in force for one year, unless avoided by subsequent expressed condition. The words,. “ with permission to navigate the Ohio and Mississippi river below Cairo,” are written in the printed policy immediately after the clause providing for its termination, but *338 their natural position in the contract is immediately preceding that clause.
We will look in vain through the contract, filled with stipulations, conditions, and warranties, for any provision -which expressly avoids it in a case of this kind. While there are numerous conditions and stipulations in which it is expressly avoided if they are not complied with, there 'is none avoiding it for a temporary deviation.
Thus, under the head of “ obligations of the assured,” 'it is to be void if the insurance exceeds $22,500} or upon .assignment of the policy- or’ charter of the vessel without the approval of the company indorsed thereon, or during the time hemp shall be carried on deck uncovered, or lime 'in the hold, or cotton on the hurricane deck; also, if the premium notes are not paid in fifteen days after maturity, :and remain void until paid.
It is also provided it shall cease while the vessel is in the custody under proceedings in law or in equity, except during five‘days after seizure; and that a violation or noncompliance with any such conditions vitiates the policy.
Under the same head, in what is called the warranty •clause,” there are many warranties, stipulations and conditions, in some of which the penalty expressly named ■for their violation av’oids, or rather suspends the policy. In that clause relating to unseaworthiness, it is provided that the policy shall be void while the vessel is unseaworthy, except while going to a port for repairs, or while they are being made.
As there is no express, condition avoidingthis policy for the cause in question, we may well apply the maxim, ■“ expressio unius exclusio alterius.”
As there is no exjness condition, let us further inquire 'if there is any implied from the express terms of the policy. The contract of the insurer is for one year, “ unless .sooner terminated or made void by' conditions hereinafter expressed. From this it is clear it can not be avoided by any implied conditions.
*339 We are thus left to inquire as to the legal effect of the i( conditions expressed.”
It is said the permission to navigate certain waters is equivalent to prohibiting the navigation of all others. We agree with Ch. v. Marshall in Yeadon v. Fry, supra. These “ are the words of the insurer, not of the insured, and they take a particular risk out of the policy, which but for the exception would be comprehended in the contract.” They do not amount to a warranty.
The stipulation in the warranty clause, “ the said vessel shall be run and navigated upon the privileged waters as is usual for vessels of her class in the usual prosecution of business,” has no provision avoiding the policy if violated, though a failure to run and navigate the vessel as usual would, if loss ensue from such neglect of duty, avoid it. If no loss ensued from such failure, and a loss does happen from a subsequent cause insured against, no one would claim that the policy was void. Clearly this clause relatesto the mode and manner of navigating the vessel within the permitted waters. It is ¿Lot a warranty by the assured that he will navigate no other waters, but only that he will navigate the permitted waters in a proper and skillful manner, as is usual with boats of her class. This clause can not have two distinct and incongruous meanings, one to provide against unskillful use of the boat within the permitted waters, the penalty of which is to defeat the policy when it is the cause of a loss, and the other to avoid the policy, however skillfully it is done, if there is a deviation from these waters.
Again, we must keep in mind the difference between a voyage and a time policy.
The voyage policy insures a voyage from a terminus a quo to the terminus ad quern, in a preséribed course, which though seldom set out in the policy, forms part of it, and is as binding on the insured as though mutually detailed. The voyage being'in the course of navigation on and in which the ship actually sails. If there is a voluntary variation from this course, it is a deviation, because it is an *340 abandonment of tbe voyage which was insured, and for any subsequent loss from any cause whatever the boat is uninsured.
The voyage actually made is not the voyage insured, therefore no recovery can be had.
A policy on time insures no specific voyage, but covers any voyage within the prescribed time, and the loss and damage the ship may sustain by the perils insured against within the limited period. 1 Arnold on Ins., 333 and 409.
Strictly speaking there can be no deviation in a purely time policy, if the vessel sails upon any voyage for which she is seaworthy. “ Like the former silent warranty, it is presumed that this does not operate when a ship is insured on time.” Hopkins’ Man. of Ins., p. 184.
The other silent warranty here spoken of is seaworthiness : “ But policies on time have recently come into use, partly, no doubt, to obviate the danger arising from the-doctrine of deviation, which, though often slight, and quite immaterial to the actual risk, has often defeated contracts-of insurance, where there has been no increased risks, and thereby done much to prevent the ^benefits afforded to commerce by honest insurance.” Cafin v. Wash. Ins. Co., 12 Cush. 537.
There is still another class of policies, which partake of the nature of both, which may be called mixed policies :• As, “ at and from A to B for six months;” or, “ at and from Liverpool to New York from January 1st, 1847, to January 1st, 1848.”
In speaking of these mixed policies, Arnold says (vol. 1, p. 412) : “ They agree with time policies in this, that the underwriter can not be liable for any loss incurred by the subject of the insurance unless it occurred within the limits of the time specified in the policy; and, on the other hand, they "are so far similar to voyage policies that the• ship must have originally sailed on the voyage prescribed in the policy, and the underwriter will not be liable for any loss, though incurred within the limits of the time, unless- *341 the ship at the time of the occurrence be sailing on the prescribed, course between the termini of the voyage.”
Strictly speaking, a ‘ deviation ’ originally meant only a departure from the course of the voyage, but now it is always understood in the sense of a material departure from •or change in the risk insured against, without just cause.” 2 Parsons Mar. Ins., p. 1.
On page 5 the same author says: “Nor are they 'discharged if the' change of risk is merely temporary, and, when it' ceases, all subsequent risks are precisely -and certainly the sáme as they would have been had no deviation taken pláce. In this case, the effect of the ■deviation is only to suspend the responsibility of the insurers, and discharge them from any liability for a loss which occurs during the existence of the deviation. But it is obvious that there are very few changes of risks that can be said to leave all the subsequent perils in precisely the same condition as if there had been no change; and this exception, therefore, is seldom applicable.”
And in note 2, to the above, he says: “Mr. Justice Sedgewick, in delivering the opinion of the court, in Coffin v. Newburyport Mar. Ins. Co., 9 Mass., 436, 449, said: ‘It 'is undoubtedly true that the shortness of the time, or the •distance of a deviation, makes no difference as to its effect ■on the contract. Whether for one hour or one month, or for one mile or one hundred miles, the consequence is the same. If it be voluntary and without necessity, it puts an end to the contract.’ It would seem., however, that there may be a temporary deviation, which would exonerate the underwriters for loss during such deviation, but not for a subsequent loss. ‘Thus, if a steamboat which makes regular trips between two ports is insured for one year, and if, after the trip for the day is ended, she should tow a vessel or do any other ■similar act, the underwriters might be liable if she were •subsequently lost on a regular trip or while lying in port, .although not if she were lost while engaged in towing.”
In a voyage policy the time of starting and the course of *342 tbe voyage, with its termini, áre important with reference to winds, storms, &c.
In a time policy, as there is no voyage named and no time' specified, these considerations are of little importance.
The case of Greenleaf v. St. Louis Ins. Co., 37 Mo. 30,. presents the whole question upon the right ground. In the policy sued upon in that case, insuring the steamer, after the language found in this policy, was the following: “ The Missouri, Arkansas, White, Red and Yazoo Rivers-excepted.”
The court says : “ The language here does not amount-to a prohibition or a condition, or a warranty. The words-without the exception would embrace all the tributaries of the above mentioned rivers. The exception has the effect of restraining or suspending the liability of the underwriters in a certain event. If the intention had been that the-policy should be defeated by making voyages on any of the excepted rivers, that intention would have.been expressed. But if there is any .doubt of it, that exception being made-by the parties for their own benefit to relieve themselves-from a risk which they otherwise would have incurred, the doubt is to be resolved against them. The policy did not amount to a prohibition or warranty against navigating-the excepted rivers, on the part of the assured, but to a suspension of the risk during the period the boat was so employed.”
This is not like the case of Con. Mut. Ins. Co. v. Stevens, which contained a warranty that the vessel should not use-certain ports, and these were a breach. 2 Parsons, note 3,. page 5.
In Palmer v. The Warren Ins. Co., 1 Story 364, Judge-Story says: “Exceptions, therefore, in a policy, if they admit of any other reasonable interpretation, ought not to-be construed as cutting down the policy to a particular voyage, excluding all others, but to be deemed exceptions-of time and risks in particular ports or parts of voyages.”
“If a policy of insurance were, underwritten for a year-on a ship, excluding the month of October, we should say *343 that it was but an exception of that month. If a policy was on all the cargo on board a ship, excluding the fruit on board, we should deem it a mere exception of the fruit. On the other hand, if the words were, excepting the fruit on board, we should as readily say that' the fruit was excluded from the risks stated by the policy. But in neither case should we say that fruit was prohibited from beiug taken on board in the voyage. It does not appear to me,, therefore, that any difficulty in the interpretation of the-clause arises from any grammatical inaccuracy in the use of language. It will make no difference, in my judgment,, in the present case, whether the word ‘ excluding,’ in this policy, is interpreted in its more common sense of shutting out, or in the sense of ‘ excepting,’ although I have no doubt that the latter is the true and appropriate sense in the clause of the policy under consideration.”
In determining the character of the words “ with permission,” &c., the form of the expression, and the connection in which it is found in relation to other parts of the instrument (98 Mass. 391) are suggestive on the question of intention.
They are the words of the insurer, in form permissive, and not prohibitory, and in connection with the stipulations which define the obligations of the underwriter.
They do not purport to be the covenants of the assured, and are not in that part of the policy containing his obligations.
When, as in this case, it is evident the underwriters have taken much pains to insert so many stipulations in the form of covenants or obligations by the assured, and provide that the policy shall be avoided for a non-performance of some of them, the presumption arises, especially when taken in connection with- the general provision in the beginning of the policy, that it is to continue one year, “ unless sooner terminated or made void by conditions hereinafter expressed that if it had been the intention of of the parties to avoid the policy for such a temporary departure, that intention would have been expressed. We *344 do not feel authorized by tbe current of modern authority to create by an enlarged construction implied warranties in policies of this nature, calculated to defeat the terms of the instrument, but rather incline, in cases of doubt, to that construction which is most conducive to the interests of commerce and the intention of the parties as disclosed by a fair interpretation of the contract.

Judgment reversed, and cause remanded.

Scott, J., dissented.