# WHEELING.

## LUCAS *v.* INSURANCE CO.

Submitted June 7, 1883—Decided December 15, 1883.

1. A policy taken out by a merchant against loss by fire describes the property insured as "his stock of pianos, organs and other musical instruments, sheet-music and such other goods as are usually kept for sale in a music-store, his own, or held by him in trust or on commission or sold but not delivered contained in a certain store-room desbribed," will cover a piano left at the store-room in charge of the insured for any purpose connected with

his business, as, to have it forwarded to a northern city to be repaired. (p. 268.)

2. The entire value of such a piano, if destroyed by fire while at such store, if it does not exceed the sum insured, may be recovered by the assured; and the merchant after satisfying his own charges for the keeping and other services in relation to such piano must hold the remainder as trustee for the owner of the piano. (p. 282.)

3. The words in such a policy "held in trust" mean "property intrusted to the insured as a merchant for its keeping;" they do not mean property held by the insured as a trustee in the technical sense of that word. (p. 273.)

4. Such piano so left with the merchant for any purpose connected with his business would be covered by such a policy, though the merchant had received it merely for accommodation and did not intend to make charge for keeping it or for any labor or service in connection with it. The mere possession of the property by the merchant and its being in his charge would give him an insurable interest in such piano; and the policy might be sued on by him, if such piano was destroyed by fire, though when recovered he might hold the full amount of the recovery only as trustee for the owner of the piano. (p. 282.)

5. A provision in such a policy that "goods held on storage must be separately and specifically insured" would not prevent the recovery on such policy of the value of such piano so "held in in trust" by the assured though such piano was not separately or specifically mentioned in such policy. (p. 283.)

GREEN, JUDGE, furnishes the following statement of the case:

At December rules, 1880, Charles Y. Lucas filed his declaration in the municipal court of Wheeling against the Liverpool and London and Globe Insurance Company under section 1 of chapter 66 Acts of 1877 p. 89. The declaration was as follows:

"IN THE MUNICIPAL COURT OF WHEELING,  }
                              December rules, 1880. }

"Charles. Y. Lucas complains of the 'Liverpool and London and Globe Insurance Company,' a corporation incorporated by that name and formed and existing under and by virtue and authority of the laws of the United Kingdom of Great Britain and Ireland, and existing and having its principal place of business in the city of Liverpool, England,

which has been summoned to answer this, for that the defendant, by virtue of the policy of insurance, a copy of which is herewith filed, owes fifteen hundred dollars to the plaintiff for loss in respect to the property insured by said policy caused by fire on or about the 25th day of March, in the year 1880, at the city of Wheeling in the county of Ohio and State of West Virginia.

"Wm. P. Hubbard,

"A. J. Clarke,

*"Attorneys for Plaintiff Charles Y. Lucas."*

With this declaration was filed a copy of the policy of insurance sued on, the parts of which, important for the purposes of this suit are as follows:

"This policy of insurance witnesseth, that C. Y. Lucas, esq., of Wheeling, West Virginia, having paid to the Liverpool and London and Globe Insurance Company the sum of thirteen ($13) dollars, for the insurance against loss or damage by fire (subject to the conditions and stipulations which constitute the basis of this insurance) of the property hereafter described, to the amount hereinafter mentioned, not exceeding upon any one article the sum specified, namely, *two thousand dollars on his stock of pianos, organs and other musical instruments, sheet music, and such other goods as are usually kept for sale in a music store, his own or held by him in trust or on commission, or sold but not delivered, contained in the first story of the three and two story brick slate-roof building, situate No. 1227 west side of Market street, Wheeling, West Virginia.*

"1. If any application, survey, plan or description of the property herein insured is referred to in this policy, such application, survey, plan or description shall be considered a part of this contract and a warranty by the assured, and any false representation by the assured of the condition, situation or occupancy of the property, or any omission to make known every fact material to the risk or any over-valuation, or any misrepresentation whatever, either in a written application or otherwise, or if the assured shall have or shall hereafter make any other insurance on the property hereby insured, or any part thereof, without the consent of the company written hereon, or if the above mentioned premises

shall be occupied or used so as to increase the risk or become vacant or unoccupied, and so remain, without notice to and consent of this company in writing, or the risk be increased by the erection or occupation of neighboring buildings, or by any means whatever within the control of the assured, without the assent of this company endorsed hereon, or if it be a manufacturing establishment running in whole or in part over or extra time or running at night, or if it shall cease to be operated without special agreement endorsed on this policy, or if the property be sold or transferred, or upon a passing or entry of a decree of foreclosure, or upon a sale under a deed of trust, or if the property insured be assigned under any bankrupt or insolvent law, or a change take place in title or possession, except in case of succession by reason of the death of the assured, whether by legal process or judicial decree or voluntary transfer or conveyance, or if this policy shall be assigned before a loss without the consent of the company indorsed hereon, or if the interest of the assured in the property, whether as owner, trustee, consignee, factor, agent, mortgagee, lessee or otherwise, be not truly stated in this policy, or if the assured shall keep gunpowder, fireworks, nitro-glycerine, phosphorus, saltpetre, nitrate of soda, petroleum, naphtha, gasoline, benzine, benzole or benzine, varnish, or keep or use camphene, spirit gas, or any burning fluid or chemical oils without written permission in this policy, then and in every such case, this policy shall be void.

"4. If the interest of the assured in the property be any other than the entire unconditional and sole ownership of the property, for the use and benefit of the assured, or if the building insured stands on leased grounds, it must be so represented to the company, and so expressed in the written part of this policy; otherwise the policy shall be void. When property has been sold and delivered, or otherwise disposed of so that all interest or liability on the part of the assured herein named has ceased, this insurance on such property shall immediately terminate. Goods held on storage must be separately and specifically insured.

"7. In case of any other insurance upon the property hereby insured, whether made prior or subsequent to the date of this policy, the assured shall be entitled to recover of this

company no greater proportion of the loss sustained than the sum hereby insured bears to the whole amount insured thereon, without reference to the dates of the different policies, or their invalidity from want of notice of this or other insurance, or from the violation of any of their conditions, or the insolvency of any or all the other insurance companies; and it is hereby declared and agreed that in case of the assured holding any other policy in this or any other company on the property insured, subject to the conditions of average, this policy shall be subject to the average in like manner. Re-insurance in case of loss to be settled in proportion as the sum re-insured shall bear to the whole sum covered by the re-insured company."

All of which was in print except that portion above italicised. The whole of the residue of the policy except a few dates and sums was printed. The defendant asked the court under section 2 chapter 66 of Acts of 1877 p. 89, that the plaintiff might be ordered to file a more particular statement of his claim or the facts expected to be proved at the trial; and on November 19, 1881, the plaintiff filed in open court this as the specific statement of his claims:

CHARLES Y. LUCAS, *Plaintiff*,
     *vs.*
THE LIVERPOOL AND LONDON AND GLOBE   ⎫ In *Assumpsit.*
  INSURANCE COMPANY, *Defendant.*   ⎭

The plaintiff now comes and files the following as a more specific statement of his claim in this cause against the defendant, and says that the defendant, by virtue of the policy of insurance, a copy of which is filed with the declaration, owes the plaintiff for loss in respect to the property insured by said policy, caused by fire on or about the 25th day of March, 1880, at the city of Wheeling, in the county of Ohio, and State of West Virginia, as follows:

| | |
|---|---:|
| The amount of value of plaintiff's own property, and that held by him in trust and in commission, which amount was admitted by their adjuster and agent of the defendant in the city of Wheeling, about April 30, 1880, and also admitted by the defendant to be due from said defendant ..... | $550 62 |
| The additional amount of value of piano owned by A. Wilson Kelly and held in trust for him by the plaintiff....................................................... | 500 00 |
| | $1,050 62 |

Add interest from April 30, 1880.

A. J. Clarke, of counsel for the plaintiff, being first duly sworn, says that the foregoing statement will be supported by evidence at the trial, as he verily believes.

A. J. CLARKE.

Subscribed and sworn to before me this 19th day of No-. vember, 1881.

THOS. M. DARRAH,<br>
*Clerk of the Municipal Court of Wheeling.*

On January 2, 1882, under section 4 of chapter 66 of Acts of 1877 p. 90, the defendant pleaded: "That he is not liable to the plaintiff as in said declaration is alleged," to which plea the plaintiff replied generally. On February 4, 1882, the following order was entered:

"This day came the parties, by their attorneys, and the defendant tendered two pleas of tender, which were objected to by the plaintiff, but the court overruled the objection and permitted said pleas to be filed, to which action of the court the plaintiff excepted; and thereupon the plaintiff replied generally to each of said pleas, and issue is thereupon joined, and neither party requiring a jury, both parties consenting that the court should try the issue joined therein, the court proceeded in lieu of a jury to hear the evidence and the arguments of counsel; and the evidence and arguments of counsel being fully heard, and the court not being advised as to its decision, takes time to consider thereof.

"Defendant's first plea, filed in open court this 4th day of February, 1882.

"THOS. M. DARRAH, *Clerk.*"

The first of these pleas was as follows:

"And the said defendant, by its attorney, comes and says that the said plaintiff ought not to have or maintain his action aforesaid against it to recover the sum of five hundred and fifty dollars and sixty-two cents named and set forth in the 'more particular statement of plaintiff's claim,' filed on the 19th day of November, 1881, in this case, because said defendant says that said defendant, (the said sum of five hundred and fifty dollars and sixty-two cents being then due and payable by said defendant to said plaintiff, and no other sum being due or payable by reason of the policy in plaintiff's declaration mentioned, to-wit, on the 13th day of December,

1880,) was ready and willing and there tendered and offered to pay to the said plaintiff the said sum of five hundred and fifty dollars and sixty-two cents, to recover which the said plaintiff there wholly refused. And the said defendant avers that it was not then, and is not now, and was not at the institution of this suit, in any way liable by virtue of said policy in plaintiff's declaration to the said plaintiff in any other or greater sum than said sum of five hundred and fifty dollars and sixty-two cents aforesaid; and this it is ready to verify. Wherefore it prays judgment whether plaintiff can maintain his action aforesaid against it."

The second special plea was substantially the same, differing only slightly in form.

On June 6, 1882, the court entered this judgment, the case having been by consent submitted to it:

"This day came the parties, by their attorneys, and the court having on the 4th day of February, 1882, heard the evidence and arguments of counsel, and taken time to consider of its judgment, now doth find that the plaintiff is entitled to recover of the defendant the sum of one thousand one hundred and eighty-two dollars and eighty cents, the aggregate of principal and interest as claimed in plaintiff's declaration to this date. Therefore it is considered by the court that the plaintiff recover of the defendant the sum of one thousand one hundred and eighty-two dollars and eighty cents, the aggregate of said principal and interest, with interest on said aggregate amount from this 6th day of June, 1882, till paid, and his costs by him about his suit expended. And thereupon the said defendant moved the court to set aside said judgment and grant it a new trial, which motion is overruled by the court; to which opinion, action and ruling of the court the defendant excepted and tendered its bill of exceptions, which is signed, sealed and made part of the record in this cause."

The bill of exceptions referred to sets out all the evidence. The facts proven so far as deemed material are as follows: When this policy was issued the plaintiff had for several years been doing a music-business in Wheeling. It was his custom as a music-dealer, as it was that of others in Wheeling and elsewhere, among other things to buy and sell

pianos, to move pianos for persons from one locality to another in Wheeling, to store pianos for persons in Wheeling, and to send off to northern cities pianos for persons to be repaired, he making all the arrangements as well as contracts to get such repairing done. The policy of insurance sued on was issued on May 27, 1879, and no understanding of any sort between the parties was shown to have been entered into by them other than that shown on the face of the policy. About March 8, 1880, A. Wilson Kelly applied to the plaintiff, C. Y. Lucas, to move for him his piano from his residence on Twelfth street to a boarding house on Main street. Lucas attempted to move it; but because of the narrowness of the stairway at the boarding-house was unable to get it into the room, into which it was to be put. And he then not being able to put it into this boarding-house, had it taken to his music store and placed in the first story of his store with his stock of pianos. Kelly the next day called to see him about this matter; the plaintiff, Lucas, pointed out to him a crack in the end of his piano and Kelly directed him to send it to the Steinways, New York, to have it repaired, but instructed him before sending it off to write to them to ascertain whether they would not repair it without charges under their warranty, the piano having been bought of them. But whether they would or not, Lucas was directed to have it repaired. Lucas accordingly wrote such a letter; but before he received a reply to it, the fire of March 25, 1880, occurred burning down his store and destroying a good deal of his stock and also the piano of Kelly's held there in trust by him.

The goods of the plaintiff in this store-room destroyed by this fire were agreed by the parties to be worth eight hundred and twenty-six dollars and sixteen cents. The pianos and organs of other persons which Lucas had on hand for sale on commission, and which were destroyed, were worth one hundred and ten dollars. Lucas had another insurance on the property in the Peabody Company; and of this nine hundred and thirty-six dollars and sixteen cents, it was agreed by all parties interested, that the Liverpool and London and Globe Company should pay five hundred and fifty dollars and sixty-two cents, and the balance three

hundred and eighty-five dollars and fifty-four cents, should be paid by the Peabody Company. This understanding was had March 31, 1880, less than a week after the fire. At that time the destruction of this piano of A. W. Kelly worth then fivehundred dollars was spoken of, and the circumstances under which it was taken to the store of the plaintiff were stated, but the agent of the defendant in this suit, who was arranging how much should be paid by the defendant, declared emphatically, that the defendant was not and could not under this policy be liable to pay this five hundred dollars. Plaintiff supposed he knew, but still asked him if the defendant would hold him, Lucas, harmless, · if A. Wilson Kelly should hold him responsible for the loss of his piano. This was promised by this agent of the defendant, but when this guarantee of the defendant, that the plaintiff should be held harmless from any loss by reason of the destruction of this piano of Kelly's, was reduced to writing, the defendant refused to sign it and repudiated its promised guarantee, and thereupon plaintiff made out and swore to a supplemental proof of loss, claiming in addition to the five hundred and fifty dollars and sixty-two cents agreed to on March 31, 1880, the further sum of five hundred dollars for the destruction of this piano of Kelly's. And in it were stated and sworn to the facts above stated with reference to this indemnity, and they were assigned as the reason, why this five hundred dollars was now claimed, and why it had not been claimed on March 31, 1880, at the time of the first proof of loss. The defendant offered to pay the five hundred and fifty dollars and sixty-two cents if the plaintiff would· receive it in full of all demands under this policy and sign a receipt to that effect, but refused to pay it, unless he would thus receive it. Plaintiff declined to receive this five hundred and fifty dollars and sixty-two cents on these terms; and Kelly advanced him this five hundred and fifty dollars and sixty-two cents, which he needed in his business, and this suit was brought. On June 12, 1876, while residing on Twelfth street, Kelly had obtained from the Fire and Marine Company, Wheeling, W. Va., a policy of insurance for five thousand dollars on his residence on Twelfth street, the furniture in it including this piano and property upon the lot

attached to this house.   This piano in this policy was valued at seven hundred dollars.   This policy was as follows:

"In consideration of the receipt of sixty-two dollars and fifty cents, do insure A. W. Kelly esq., at Wheeling, W. Va., against loss or damage by fire to the amount of five thousand dollars as follows, viz:

"Two thousand eight hundred dollars on his two-story brick house and frame porches, situate No. 90, south side Twelfth street, Wheeling, W. Va., occupied by the assured as a dwelling; seven hundred dollars on household and kitchen furniture, including carpets, beds, bedding and wearing apparel; seven hundred dollars on piano; seventy-five dollars on library; seventy-five dollars on pictures; one hundred and fifty dollars on solid and plated silverware (all contained therein); four hundred and fifty dollars on carriage; fifty dollars on harness, contained in his stable on premises above described and in rear of said dwelling.   And the said company hereby agrees to make good unto the said assured, his executors, administrators. and assigns, all such immediate loss or damage, not exceeding in amount the sum or sums insured, as above specified, nor the interest of the assured in the property, except as herein provided, as shall happen by fire to the property so specified from the 12th day of June, 1876, at twelve o'clock at noon, to the 12th day of June, 1879, at twelve o'clock at noon, the amount of loss or damage to be estimated according to the actual cash value of the property at the time of the loss, and to be paid sixty days after due notice and proofs of the same shall have been made by the assured and received at this office, in accordance with the terms and provisions of this policy, unless the property be replaced or the company shall have given notice of their intention to rebuild or repair the damaged premises," &c.

This policy expired on June 12th, 1879; and there is no proof in the record, that it was ever renewed in any manner. Yet A. Wilson Kelly and the secretary of the Fire and Marine Insurance Company of Wheeling seem both of them to have regarded this policy as in force on March 8, 1880; for at that time Kelly informed the secretary, that he intended moving from his residence on Twelfth street to the boarding house on Main street, and wanted to know if he could then

move the piano and have it regarded as still insured. The secretary told him that as the risk would be greater at the boarding house from fire, the premium would have to be increased, but he had no doubt they could agree upon it, and that it would be necessary to endorse the permission to change the location of the piano on the back of the policy, which he must bring to him for that purpose. The policy was never brought to him for that purpose. The secretary did not know that the piano was taken to the store of the defendant till after the fire. The day after the fire he demanded payment for this piano of this company and they refused to pay and he acquiesced.

From the judgment of the municipal court of Wheeling of June 6, 1882, a writ of error and *supersedeas* has been obtained.

*Robert White* for plaintiff in error.

*W. P. Hubbard* and *A. J. Clarke* for defendant in error.

GREEN, JUDGE:

The principal question in controversy in this case is the true construction of this clause in the policy issued by the defendant to the plaintiff: "This policy witnesseth, that C. Y. Lucas having paid to the Liverpool and London and Globe Insurance Company thirteen dollars for the insurance against loss or damage by fire of the property hereinafter described, namely, two thousand dollars on his stock of pianos, organs and other musical instruments, sheet music and such other goods as are usually kept for sale in a music store, his own or held by him in trust or on commission or sold but not delivered, contained in the first story of the three and two story brick, slate-roof building, situate No. 1227 west side of Market street, Wheeling, West Virginia, the five directors of the said company, whose names are hereto subscribed, do hereby agree that from the 22d day of May, 1879, until the 22d day of May, 1880, the funds and property of the said company shall be subject and liable to pay, reinstate or make good to the said assured such loss or damage as shall be occasioned by fire to the property above men-

tioned and hereby insured not exceeding said sum." The main difficulty in construing this clause is to determine, what character of property in said first story of said building was thereby insured. It is described as "his stock of pianos, organs and other musical instruments, sheet music and such other goods as are usually kept for sale in a music store, his own or held by him in trust or on commission or sold but not delivered." Language more or less resembling this has been frequently construed, when found in fire insurance policies, as descriptive of the property insured. We will refer to a number of these cases, as they will greatly aid us in interpreting this language.

In the case of *London and N. West. Rail. Co.* v. *Glyn*, 1 Ell. & Ell. 652 (4 Bennett's Fire Ins. Cas. 341), the goods of the insured, which were included in the policy of insurance, are thus described: "Goods their own and in trust as carriers in a warehouse situate at the Camden town station of the London and Northwestern Railway." Wrightman, J., espressing the views of the court says: "The question in this case is, whether the plaintiffs are entitled under this policy to recover more than their own particular interest in the goods, which they as carriers had in the warehouse, when it was burnt. I think that they are; and that they ought to recover the full value of the goods. They must in my opinion be considered as having insured the goods, which they held in trust as carriers, for the benefit of the owners, for whom they will hold the amount recovered as trustees, after deducting what is due in respect to their own charges upon the goods. It is not contended, that there is anything illegal in this policy. The plaintiffs are clearly entitled to recover something; the only question is how much. Now when the terms of the policy are looked at, it appears that the plaintiffs thereby insure 'goods their own and in trust as carriers' in the warehouse. Thus a distinction is drawn between their own goods and goods which as carriers they hold for other people; and it appears to me that both classes of goods were meant to be fully covered by the insurance, and that the description of some of the goods as 'goods in trust as carriers' was inserted for the express purpose of protecting the interest of the owners of such goods as well as the more

limited interest of the plaintiffs.  It is true that this insur-
ance is in the nature of a voluntary trust undertaken by the
plaintiffs without the knowledge of the *cestuis que trust* the
owners of the goods; but it is a trust clearly binding on the
plaintiffs in equity, who will hold the amount which they
now recover, in the first place for the satisfaction of their own
claims, and in the next, as to the residue, in trust for the
owners.  I have no doubt that the intention was as I have
stated.  The circumstances that the plaintiffs in consequence
of the non-compliance with the carriers' act are not liable as
carriers, to the owners for the loss of the goods, is not, as it
seems to me, very material to the present question.  In
*Waters* v. *The Monarch Insurance Co.*, 5 E. & B. 870, the
plaintiffs being warehouse men and therefore not insurers,
were not liable to the owners of the goods, which were
burnt; but the court held that that fact did not prevent the
insurance company from being liable to the plaintiffs for the
amount of the full value of the goods, although the utmost
interest, which the plaintiffs themselves had in the goods,
was to the extent of their warehouse charges, for which they
had a lien upon them."

The case of *Waters* v. *The Monarch Insurance Co.*, 5 E. &
B. 870, referred to is reported in 4 Bennett's Fire Ins. Cases
49.  In this case two policies of insurance were sued on, in
one of which the property insured was described as "goods
in trust or on commission in a certain warehouse."  In the
the other the goods were described as "corn and flour the
property of the assured, or held by them in trust, or on
commission on any of the public wharves in five miles of
London."  This insurance was taken by a corn and flour
factor; no charge was made to his customers for insurance,
nor were they informed of the existence of these policies.  It
was decided, that when the warehouse of the insured was
burned and his customer's goods destroyed, the plaintiffs
were entitled to recover their full value; for the customer's
goods "were in trust" within the meaning of these
policies.  Lord Campbell, C. J., says: "What is meant in
those policies by the words 'goods in trust?'  I think that
means goods, with which the insured were intrusted, not
goods held in trust in the strict technical sense, so held that

there was only an equitable obligation on the assured en-
forcible by *subpœna* in chancery, but goods with which they
were intrusted in the ordinary sense of the word.   They
were so intrusted with goods deposited on their wharves; I
can not doubt the policy was intended to protect such goods,
and it would be very inconvenient if wharfingers could not
protect such goods by a floating policy.   Then, this being
the meaning of the policy, is there anything illegal in it?
It can not be disputed it would be legal at common law; and
I think that a person intrusted with goods can insure them
without orders from the owner, and even without informing
him there is such a policy.   It would be most inconvenient
in business if a wharfinger could not, at his own cost, keep
up a floating policy for the benefit of all those who might
become his customers.   The last point that arises is:   To
what extent does the policy protect those goods?   The de-
fendant says it was only the plaintiff's personal interest.   But
the policies are in terms to make good "all such damages
and loss as may happen by fire to the property hereinbefore
mentioned."   That is a valid contract; and if the property
is wholly destroyed, the value of the whole must be made
good, not merely the particular interest of the plaintiffs.
They will be entitled to apply so much to cover their own
interest, and as to the rest will be trustees for the owners.
The authorities are clear that an assurance made without
orders may be ratified by the owners of the property and
then the assurors become trustees for them."

These English decisions have been generally followed in
this country.   Thus in *Siter* v. *Morris*, the policy of insurance
against fire of a particular building of a commission and
forwarding firm covering "merchandise generally and with-
out exception, their own or held in trust or on consignment,"
was decided to apply to property in the building destroyed
by fire consisting of household furniture, wearing apparel
and books received and held in deposit by the firm subject
to the order of the owners, as well as to the property of the
firm, and goods consigned to them on commission; and the
owner can recover his proportionate share of the amount
awarded by the policy and paid over by the insurance com-
pany to the firm, in an action for money had and received.   The

court says: "Such policies are adapted to the varied wants of a large mercantile community, and the construction which gives to all the property fairly within the language used *equal protection* does but carry out the true meaning and actual purpose of the parties in whose name the instrument was obtained. That it covers the whole value of all such property as between him and the insurer and not the mere interest of the former had been decided in *DeForest* v. *Fulton Fire Insurance Co.*, 1 Hall's R. 84, 118, 136. That such was the intention of the parties it seems to me impossible to doubt. What other meaning would the parties have had? Why, having provided for their own property and property held on consignment, was that held *in trust* mentioned? What else does it mean in this connection, but property the custody and possession of which was in themselves but the actual ownership in others? The defendant's business sufficiently indicates this. At a small expense, much more than repaid by their augmented business, induced by the confidence which an insurance would inspire, they procured their policy. Its terms places all the goods within the warehouse from time to time on the same level, all are equally protected."

In *The Home Ins. Co.* v. *Favorite et al.*, 46 Ill. 265, the property insured was thus described in the contract of insurance sued on: "Hogs, cattle and the products of the same, salt, cooperage, boxes, and articles used in packages, their own or held by them in trust or on commission or sold but not delivered, contained in certain buildings specified." The court in deciding the case on page 270 says: "It is again urged, that the appellees are not entitled to recover for the loss of coopers-ware owned by Cole & Sullivan on storage with them at the time of its destruction, as it was not on commission or held legally and technically in trust." In the case of *Stillwell* v. *Staples*, 19 N. Y. 401, it was held that a policy of insurance upon goods 'the property of the insured or held by him in trust' covers cloth intrusted to him for the purpose of being manufactured into clothing. The court says it is quite apparent, that the words 'in trust' as used are not to be taken in any strict or technical sense, which would limit their operations to cases where the title to goods had been vested in a trustee, subject to some specific

trust to be executed by him, for several owners. In the first place they would be entirely unnecessary for any such purpose, and would add nothing to the force of the policy. Again the structure of the clause itself shows the meaning to be different. The anthithesis shows the words 'in trust' are meant to cover goods, not the property of the insured. But goods held in trust in the technical sense suggested would be as much his property, as between him and the insurer, as those belonging to him in his own right.' The reasoning of the court in this case is sound and fully covers the objection raised in the case at bar. We are therefore of opinion, that the contract of insurance covers property intrusted to the appellees for a compensation."

So in *Phœnix Ins. Co.* v. *Favorite et al.* 49 Ill. 262, the court say: "The barrels of Cole & Sullivan are covered by the policy which expressly applies to certain articles held in trust or on commission. We do not understand the term 'trust' to be used in any technical sense but to apply to ordinary bailments."

In the case of *Hough, Clendening & Co.* v. *Pres. and Directors People's Fire Ins. Co.*, 36 Md. 400, it was decided that "the words '*held in trust*,' applied to goods insured, mean goods, with which the assured is intrusted, not goods held in trust, in the strict technical sense, so held that there is only an equitable obligation in the assured, enforcible by *subpœna* in chancery, but goods with which they are entrusted in the ordinary sense of the word." It was also decided "that where a policy of insurance is couched in plain and unambiguous language, resort to it alone must be had to determine the intention and meaning of the parties thereto; parol proof is inadmissible for such purpose."

In the case of *Snow* v. *Carr*, 61 Ala. 363, it was held, that a policy taken out by piano and music-dealers against loss by fire, describing the property as "their own or held in trust" will in the absence of evidence to the contrary cover a piano left with them for sale or rent. In such case the insured holds the amount collected as trustee for the owner of such goods, as well as those held in his own right; and the failure to make proof of the loss of the goods of other persons, the value of his own goods being more than the amount of the

policy, which he collected in full, will not prejudice the rights of such persons; nor can he claim to have the loss of his own goods first made good out of the fund received, before owners of other goods can share therein, nor can he defeat an action by the owner of such goods for his share of the insurance-money, because such owner never requested any insurance, and did not know it was taken out until after the loss, and failed to ratify expressly or otherwise the acts of the insured in taking out the policy before the payment of the loss."

In this case was involved the interesting question, whether, if the amount of the insurance is insufficient to pay the entire loss by fire, the parties, who took out the insurance and paid for it without the knowledge even of the other party, whose goods he "held in trust," could apply the insurance-money first to pay for the goods he owned, which were destroyed by fire. The court held he could not, but that he must apply them ratably to pay his own loss and the loss of those persons whose goods he thus "held in trust." This is an interesting question; but as it does not arise in the case before us, I express no opinion upon it.

In this Alabama case the court also permitted parol evidence to be heard on the question, what goods were intended to be included in the phrase "their own or held in trust." In this respect this case is in conflict with the Maryland decision above referred to; and though the determination of the case before us would not be affected, whether we follow the rule laid down in the Maryland case or in the Alabama case, yet I will say that it does seem to me, that the rule laid down in the Maryland case is the only safe one. I can not see how we can hold words constantly used in policies, and which have received a uniform and certain construction, as ambiguous; or how we can permit any parol evidence to be heard in putting a construction on such words.

In the case of *Lockhart* v. *Cooper*, 87 N. C. 149 (42 American R. 514), the defendants were warehousemen, had a fire-insurance on leaf tobacco by them "owned or held in trust or on commission or sold and not delivered;" the plaintiff bought of them twenty-five particular and specified hogsheads of tobacco and had removed five of them, when the

rest were destroyed by the fire; the warehousemen, the defendants, lost tobacco of their own exceeding in value the whole insurance. It was held that all of the twenty-five hogsheads of tobacco had been sold and delivered to the plaintiff, and he could not therefore recover any of the insurance money of the warehousemen. The court reviews a number of the cases above cited and says: "These and other authorities relied on by the appellant, recognize an insurable interest in the depositary who has a charge upon the goods committed to his custody with a corresponding responsibility for their safe-keeping and forwarding; but none reveal a case, in which there has been an absolute sale and delivery, transferring both title and possession to the vendee, and the goods are temporarily left (without actual removal) in the place of deposit." The court then refers to the case of *Waring* v. *Fire Insurance Company*, 45 N. Y. 606 (6 Am. Rep. 146), and quotes from Folger, Judge, which shows that in that case the property insured was described as "refined carbon oil and packages containing the same, their own or held in trust, on commission or sold but not delivered contained in bonded warehouse." Subsequently part of the property was sold but remained in the possession of the insured until consumed by fire. The court said: "We have but little difficulty in holding from the peculiar phraseology of the policy, that something other was meant than property of which a contract of sale had been made but of which no delivery had yet taken place. 'Sold but not delivered' is a phrase common with insurance men and has an ascertained and definite meaning. It applies to property, of which a contract of sale has been made, but of which the ownership has not been changed by a delivery in pursuance of the contract. 'Sold but not removed' is another and, we deem, a new form to express something else. We judge that it was meant to cover that, which had been sold, and of which a legal, binding delivery had been made, the ownership and right of control of which had passed, but which had not been in fact removed, of which no change of place indicated a change of ownership and possession."

Upon the reasoning of Judge Folger the North Carolina court passed its decision. After quoting it they say: "In

our opinion this is a fair and reasonable interpretation of the claim of the policy; and the distinction is probably drawn between the expressions 'sold but not delivered' and 'sold but not removed.' The first contemplates goods sold but in a legal sense not delivered, so as to vest the title and possession in the vendee; the latter refers to what is in law a sale and delivery, but when the goods remain where they were. The delivery may be without the removal; and the latter word is substituted to give a wider scope to the contract and to extend its protection to cases not embraced before." In other words I understand the North Carolina court as construing the words "sold and not delivered" as carrying with them a negative pregnant, "but not goods sold and delivered. The case refers to the construction of these words in a policy, not specially to the words "held in trust."

In *Jackson, Owsley & Co.* v. *Ætna Insurance Co.*, 16 B. Mon. 263, it was held, that "a policy, insuring all the articles constituting the stock of a pork-house and all articles contained within the building described and appurtenant thereto, covers all within those buildings without regard to the particular ownership of each or any article, which was at the risk of the insured."

In *The Home Insurance Co.* v. *The Balt. Warehouse Co.*, 93 U. S. 527, it was decided as follows :   "A policy of insurance taken out by warehouse-men against loss or damage by fire on merchandise their own or held by them in trust, or in which they have an interest or liability, contained in a designated warehouse covers the merchandise itself, and not merely the interest or claim of the warehouse-man; and if the merchandise be destroyed by fire, the assured may recover its entire value, not exceeding the sum insured, holding the remainder of the amount recovered after satisfying their own loss as trustees for the owners. By 'merchandise held in trust' is meant goods intrusted to them for keeping."   Justice Strong, delivering the opinion of the court, page 543, says: "It is undoubtedly the law, that wharfingers, warehouse-men and commission-merchants, having goods in their possession may insure them in their own names and in case of loss may recover the full amount of insurance for the satisfaction of their own claims first and

hold the residue for the owners. (*Waters* v. *Monarch Ins. Co.*, 5 Ell. & Bl. 870; *London and Northwestern Railway Co.* v. *Glyn*, 1 Ell. & Ell., A. B. 652; *DeForest* v. *Fulton Ins. Co.*, 1 Hall 136; *Siter* v. *Morrs*, 13 Penn. St. 219.) Such insurance is not unusual even when not ordered by the owners of goods, and where so made it inures to their benefit. The words 'merchandise held in trust' aptly describe the property of depositors. The warehouse company held merchandise in trust for their customers not, it is true, as technical trustees but as trustees in the sense, that goods had been entrusted to them. That such is the meaning of the words as used in this policy, we cannot doubt. And such has been held by courts of the higher authority to be the meaning of similar words in fire policies."

Other decisions of a like character might be cited; but these are abundant to enable us to safely determine what property was covered by his insurance in the case before us. It is described as "his" (the insured's) "stock of pianos, organs and other musical instruments, sheet-music and such other goods, as are usually kept for sale in a music-store, his own or held by him in trust or on commission or sold but not delivered, contained in the first story of" a described house. It is not questioned but this includes not only pianos, which belonged to the insured, in the words of the policy "his own," but also pianos in his store, which he had there belonging to other persons for sale "on commission." But it is claimed by the appellant's counsel, that no other piano in this store-room except those held for sale on commission could be regarded as covered by this insurance. That a piano, which had been left there, in order that the assured might rent it or might send it to a northern city for repairs or for any other purpose than sale, would not be regarded as insured against fire while there.

It seems to me to be impossible to put such a construction on the language used in the policy. The policy in describing the character of the goods to be insured says : "Such other goods as are usually kept for sale in a music-store." This would of course exclude from the insurance an over-coat even had it been put in the store for sale. On the other hand a guitar would be included in the insurance, as guitars

are usually kept in music-stores for sale, and it would be so included for anything which is here said, though it had been left there not for sale but for any other purpose, for which guitars may be in a music-store, as for instance, to have strings put on it or to have it repaired in some other way. But, as if to make it entirely clear that a guitar left at the store for any such purpose was included in this insurance, the policy declares, that all such goods in this store were included in the insurance, whether they belonged to the assured ("*his own*") or were "*held by him in trust.*" And these words "*held by him in trust*" have, as we have seen, received a uniform interpretation by the courts and mean *entrusted to him for keeping or for any other purpose connected with his business.* No court has ever *interpreted* these words as meaning *entrusted to him for sale only.* In fact it would be absurd to so interpret them in this policy; for then they would be entirely unmeaning. Such property entrusted to the insured for sale is expressly covered by other words in this policy; for the policy in express words covered or insured such property "on commission" that is entrusted to the assured for *sale* on commission.

In the case of *Snow* v. *Carr*, 61 Ala. 364, the words describing the goods insured in the policy were almost identical with the words of this policy. They were: "Their stock of pianos, organs, musical instruments, musical merchandise kept by them for sale, their own or held in trust, or sold but not delivered, contained or to be contained in the two story brick slate and tin roof building No. 102 and 104 Dauphin street." The court decided that these words included a piano left at their store for rent. Of course it would have included a piano left there for repair, to put new strings upon it or for any other purpose connected with the store. That court held, as all the other courts have held, that the words *held in trust* meant entrusted to the assured for any purpose connected with his business.

The first clause in the policy in this case provides, that the defendant "shall make good to the said assured such loss or damages, as shall be occasioned by fire to the property above mentioned and hereby insured." Now the property above mentioned is "such property whether *his own or held by him*

*in trust.*"   There is here nothing ambiguous in the description of the property insured.  It is as broad as possible.  The subject was pianos, organs and other musical instruments, sheet music and such other goods as are usually kept for sale in a music store.  It was not merely an interest in these goods.  These goods in this store owned by the assured if. he had any were covered, and so were any such goods, which he held in trust.  If only the interest of the assured in these goods held in trust were intended to be insured, why did not the policy say the interest of the assured in such goods held in trust ?  The defendant binds itself "to make good the damages to the property above mentioned," not the damage which the interest of the assured in such property might sustain by fire.

Again the ninth clause of this policy provides "that it shall be optional with the company to repair or replace the property lost or damaged with other of like kind and quality within a reasonable time."  Here and nowhere else is any interest in the goods injured other than the entire ownership in any way alluded to.  It would therefore seem clear, that these goods in this store were the property intended obviously to be insured, and not the interest of C. Y. Lucas in them.  So such policies have always been interpreted, as the cases, we have cited, show clearly.  And while if a piano of a third person "held in trust" by C. Y. Lucas in this store-room was destroyed by fire, he would be entitled to receive from the company its value, yet he would hold the amount so received for the owner of the piano after deducting any charges against the property which had accrued while he thus held it in trust.  The insurance company would of course be utterly indifferent as to the amount of these charges.  The company would pay identically the same amount, whether those charges were great or small.  It would seem to follow, that the construction of their contract, the policy issued by them, as to what property was insured could in no manner depend upon any contract or the want of any contract between the assured and the owner of the property.  It would, so far as the construction of the policy was concerned, be totally immaterial, whether the assured charged or did not charge the owner of the property for his care of the property

"held in trust." In either case, if destroyed by fire, the insurance company would be responsible for its value, if the policy covered property "held in trust." The only question which could arise in such case would be, whether or not it was contrary to public policy to permit a business-man to insure the property of others "held in trust" by him, when he had no interest in the property and no charge against it. I can see no public policy, which is violated in allowing any one, who is entrusted with the possession of the property of another for any purpose, insuring it, while it is in his charge. It is very true that to prevent insuring from becoming a mere gambling transaction, the law does require the insured to have an insurable interest. (*Quarrier, Trustee,* v. *Insurance Co.*, 10 W. Va. 522.)

In *Sheppard* v. *Insurance Co.*, 21 W. Va. 379 this Court thus lays down the law on this subject: "The assured has in the property insured an insurable interest, whenever he holds such a relation to it, that its destruction by fire would involve him in pecuniary loss, or would involve others in pecuniary loss, for whom he acts, or whom he represents. Thus for instance, a common carrier has an insurable interest in the goods carried by him, which he may insure to their full value without regard to his liability to the owner of the goods. (*Crowley* v. *Cohn*, 3 B. & Ad. 478; *London & Northwestern Railway Co.* v. *Glyn*, 1 Ell. & Ell. 652.) So has a warehouse-man, though he is liable only for his own negligence to the owner. (*Waters* v. *Monarch Assurance Co.*, 5 El. & Bl. 870.) To give a party an insurable interest in property, it is not necessary that he should have any pecuniary interest therein, or that he should be even responsible for its safekeeping. If he has the care and possession of the property he may insure it in his own name for the benefit of others; and the insurance will inure to their benefit upon their subsequent assent to the insurance even when this assent is after the loss has occurred. (*Waring* v. *Indemnity Insurance Co.*, 45 N. Y. 606, 6 Am. R. 146.)"

Again in this case on page 380 it is said: "It is obvious, that the main object of the law in requiring the insured to have an insurable interest in the property insured is to discourage and prevent parties having no control or manage-

ment of property and no sort of interest in its preservation from fire but being mere strangers to the property obtaining policies on such property against its destruction by fire. Such policies would amount to nothing but wagers, whether or not the property would be destroyed by fire in a specified time. And public policy rather than justice to the insurance company requires, that the law should pronounce, as it does, such policies void." In that very case (21 W. Va. 369, syllabus 7) this Court decided: "If the personal estate of a decedent be insufficient to pay his debts, the administrator of such decedent has an insurable interest in the buildings, which belonged to his decedent; for our statute in such case authorizes him as administrator to bring a suit in chancery to have such buildings sold to pay the debts of the decedent."

This statute prevents him in such case occupying the position of a mere intermeddler, a person making a wager in reference to whether or no buildings would burn in a given time. He has not a particle of pecuniary interest in such buildings, and yet he may insure them, though he has no possession of them, merely because he may bring a suit to have them sold. These principles, it would seem, clearly permit warehouse-men, wharfingers, commission-merchants, keepers of music-stores or anybody else, whose business required them to keep the property of others in their possession on any trust or for any purpose, to insure such property, while in their possession, whether they have any pecuniary interest in the property or not, or whether they make any charge for keeping the property or not. Their possession and charge of the property abundantly justify them in the insuring of it. There is no public policy violated in permitting them to do so; for with them it is no wager whether or no the property will burn in a specified time; for if it burns, they make not one cent thereby, for the insurance-money, which they receive, they are bound immediately to pay over. So far from making money by insuring the property of others in their possession and charge, they incur a cost, the immediate benefit of which is reaped by others, their customers. The only inducement for their thus insuring the property, which they thus "hold in trust," is to increase the confidence of the community in them as business-men, and

36

thus increase their legitimate business. For this they may be justified in paying a larger insurance for having inserted in their policies not only that their own property but also property held by them in trust for others shall be covered by the insurance. Such an insurance may be advantageous to them as well as to the insurance company, while to the general public it may be decidedly beneficial. And I 'see no reason why the law should forbid the making of such a contract. I can see no public evil, which is likely to result from the making of such contracts.

To apply these principles to the case before us, the piano of A. Wilson Kelly came into the possession of C. Y. Lucas as the keeper of this music store. As the keeper of this store he was employed to remove this piano from Mr. Kelly's residence to a boarding-house. He could not get it into the room into which he was directed to remove it, and therefore he took it to his store. Mr. Kelly directed him to put it there till he, Lucas, could send it to New York to be repaired, which he instructed him to do, but told him first to write and see if he could get the makers of the piano to repair it without charge, but whether they would or not he should send it on for repair. Before he had ascertained whether the maker would charge for such repairing, the store is burned down, and this piano destroyed. The evidence does not show, what was the understanding, if any, between Kelly, and this plaintiff, Lucas, in reference to the pay he was to receive for bargaining with the piano-makers for repairing this piano, or for the trouble he would be at in forwarding it, or receiving it again when returned; and I presume there was no understanding, but of course this being done at Kelly's request, he was bound to pay Lucas then for what his services were worth. See *Hurst's Adm'r* v. *Hite*, 20 W. Va. 206; *Reas' Adm'r* v. *Trotter & Bro.*, 26 Gratt. 585.

As all this was in the regular line of business of Lucas as a keeper of the music store, as a matter of course Kelly expected to pay him for all his services. We consider it however utterly unimportant whether he did or not, for Lucas had a right, if he chose, to insure not only his own property in this store but also the property of all his customers or others who should entrust their property to him.

His possession of it and responsibility for its keeping, however slight that may have been, gave him an insurable interest in the property, whether he charged for keeping it or for his services in connection with it or not. Having this right he did enter into such contract with the defendant. The terms of this contract are unambiguous; and under it the insurance company, the defendant, was responsible not only for all the insured property in this store, belonging to Lucas, which was destroyed by the fire of March 25, 1880, but also for the value of this piano, which Lucas held in trust at that time, and which was destroyed by this fire and included in the insurance.

But it is claimed by the appellant's counsel, that this piano is not included in the property insured, because the fourth article of the policy, which was in print, provides "that if the interest of the assured in the property be any other than the entire unconditional and sole ownership of the property for the use and benefit of the assured, it must be so represented to the company and so expressed in the written part of the policy; otherwise the policy shall be void. Goods held in storage must be separately and specifically insured." As property was to be insured, which should afterwards come into the store of the assured, not belonging to him but to be "held by him in trust" for others, his customers, this fourth clause required this to be expressed in the written part of the policy; and in obedience to this requirement it was so expressed in that part of the policy, as we have seen. Of course, the provision in the printed part of the policy, that goods held in storage should be separately and specifically insured refers to goods in existence and held in storage, at the time the policy was executed, and as a matter of course it has no reference to property, which should thereafter come into the store, because of course this would not have been separately and specifically insured. Yet we have seen that the written part of this policy especially provided for the insuring of property, which should afterwards come into the store and be "held in trust." There is a provision to be found in the ninth clause of this policy, which it seems to me shows the real understanding of the parties, when this policy was issued. It is this: "In case of loss on property *held in*

*trust* or on commission, or if the interest of the insured be other than the entire and sole ownership, the names of the respective owners shall be set forth together with their respective interests therein." This shows that the understanding of the parties was, that after the loss took place, the interest of those third persons, owners of goods entrusted to the assured, were to be disclosed, and not till then. Of course their names and interest could not be disclosed till then; but the fact that they were then to be disclosed, seems to me to show clearly, that it was understood, that they, or rather their goods, were insured, whosoever they might turn out to be.

It is also insisted by the appellant's counsel, that if the liability of the defendant for the loss of this piano of Kelley's be admitted, still the judgment rendered against it by the municipal court is too great. The seventh clause of the policy provides, that in case of any other insurance on the property the loss shall be apportioned, so that this company shall have no more to pay than its proportion, and that too without reference to their invalidity from the violation of any of their conditions in their other policies. In the amicable settlement, which was made of all the losses resulting from the fire to the property owned by the assured, Lucas, or held by him on commission, there was such apportionment made, and the Peabody Company paid its proportion three hundred and eighty-five dollars and fifty-four cents, and the balance only, five hundred and fifty dollars and sixty-two cents, which was its proportion was to be paid by the defendant. On this piano of Kelly's it is claimed, that there was an insurance in the Fire and Marine Insurance Company of Wheeling, W. Va., and that the municipal court ought not to have charged the defendant with its full value, five hundred dollars, but a portion of it should have been set aside to this other company, and whether it would be enforced against them or not, it would not be charged against the defendant according to this seventh clause of the policy.

In considering this position we must first determine, whether or no at the time of this fire, March 25, 1880, there was in point of fact any other insurance on this piano. Mr.

Kelly had insured some years before that in the Fire and Marine Insurance Company of Wheeling, his residence on Twelfth street, in Wheeling, and the furniture in it including this piano at five thousand dollars.    In this policy all the household and kitchen furniture other than this piano was valued at seven hundred dollars and this piano at seven hundred dollars.    This policy as copied into the record expired on June 12, 1879, more than nine months before this fire took place.    There is no sort of proof in the record that this policy was in any manner renewed or continued in force after June 12, 1879, except that the secretary of the company and Mr. Kelly from their testimony seem for some reason to regard it as in force; for on March 8 or 10, 1880, Mr. Kelly applied to the secretary of that company for leave to move this piano to the boarding-house.    He was told he could do so, but that some additional premium would have to be paid, as the risk was increased by the removal to a boarding-house, but that this could be agreed upon by them.    He was told, that this leave to change the location of this piano would have to be endorsed on the back of the policy, which never was done, and no leave was ever had or given to take this piano to the plaintiff's store, nor did the secretary know that this had been done till after the fire on March 25, 1880. Upon these facts it would seem, that there was no insurance on this piano in the Fire and Marine Insurance Company of Wheeling on March 25, 1880, first, because so far as the record shows, the insurance which had been on it expired some nine months and more before that time; secondly, if we were to assume that it had been renewed or continued legally, of which there is no evidence in the record, still it had ceased to be an insurance on about March 10, 1880, some two weeks before this fire; for the insurance was on the furniture in the dwelling-house of A. W. Kelly; and the moment that this piano was removed from this dwelling-house and placed in the plaintiff's store without the knowledge of the company, the insurance upon it expired.    But this is regarded by counsel of the plaintiffs in error as an invalidity of the policy arising from the violation of a condition of it; and the invalidity being of this character, according to the seventh clause, there should be an abatement from the

liability of the defendant in this suit to the same extent, as if the policy of the Fire and Marine Insurance Company of Wheeling had remained in full force.

But what is meant in this seventh clause, when it speaks of the invalidity of a policy from the violation of any of its conditions? In every policy of insurance there are inserted a number of conditions, which if violated by the assured forfeits the policy. Such, for instance, as those in the policy of this Fire and Marine Insurance Company of Wheeling, "if the premises should be occupied for any trade or business," or if the assured should keep in the property insured any gunpowder, nitro-glycerine and numerous other specified articles. Now I understand this seventh clause of the policy of insurance sued on in this case to provide, that if the assured has his property insured in any other company that there should be an abatement from the amount to be paid by the defendant proportionate to this double insurance; and that this abatement shall not be prevented by the fact, that by the violation of some of these conditions the assured has forfeited his policy and can recover nothing from such other company. This is but right and reasonable. But in this case none of the conditions of the policy of the Fire and Marine Insurance Company had been violated. Nothing could be recovered from that company, not because the policy had been forfeited by the violation of any of the conditions, but because the insurance was of the furniture in the residence of A. W. Kelly on Twelfth street. Of course A. W. Kelly could remove from his residence to any other place any of his furniture; but, as it was insured only while in his residence on Twelfth street, the moment he moved any part of his furniture such part ceased to be insured. This was the understanding, as the evidence shows, of both A. W. Kelly and of the insurance company. As this piano was removed about March 10, 1880, to the store of C. Y. Lucas without the knowledge or consent of the insurance company, from that time it ceased to be insured in that company not by the forfeiture of the policy but by the fact that the policy ceased to cover this piano. This removal placed it, we have seen, where it was covered by the policy of the defendant in this suit, and at the same time placed it, where it was not cov-

ered by the policy of the Fire and Marine Insurance Company of Wheeling. It was in effect the same thing, as if the policy of the Fire and Marine Insurance Company had expired on March 10, 1880.

I conclude, therefore, that under no view of this case can the policy of the Fire and Marine Insurance Company, so far as it undertook the insurance of this piano, be regarded as in force on the 25th of March, 1880, when this fire took place. It had really expired, so far as the evidence shows, nine months before. Even under the apparently mistaken views of the parties to this policy it had ceased to exist some two weeks before this fire, that is, on March 10, 1880. This being the case, there could properly be no abatement under the seventh clause of this policy.

In stating this case I have omitted a number of matters, which were proven, because I deemed them entirely irrelevant. The rights and liabilities of all parties were fixed the moment the fire of March 25, 1880, occurred. The plaintiff has certainly since then done nothing, whereby he has released the defendant from any liability. Nor has he in any manner estopped himself from insisting in this suit on all his rights. The fact, that the agents of the defendant and other insurance-men have expressed themselves with confidence, that the defendant was not responsible for the value of this piano of A. W. Kelly; the fact, that A. W. Kelly at first thought, that the Fire and Marine Insurance Company was responsible to him, and did not then think, that the defendant in this suit was responsible for the value of his piano; the fact, that the plaintiff was at one time of the same opinion, and the fact, that A. W. Kelly is aiding in the prosecution of this suit, as he ought to do, in no manner affect the plaintiff's rights in this suit. The intentions of the plaintiff and of the defendant in making the contract sued upon must be gathered from the words of the contract, which are plain and unambiguous, and from no parol proof. Certainly the ideas of parties with reference to their rights under this contract, proven by their declarations nearly a year after the making of the contract and after the expiration of it, ought to have no sort of influence with the Court in construing the contract. The plea of tender ought to have been

rejected by the court, as it was not shown that the defendant was yet ready to pay the money, it admitted to be due, and did not tender it in court, as it should have done. See Co. Lit. 207a; *Panel* v. *Nevil*, 2 Dy. 150a. But the admission of these improper pleas in this case prejudiced no one, as it turns out.

For these reasons the judgment of the municipal court of Wheeling of June 6, 1882, must be affirmed; and the defendant in error must recover of the plaintiff in error his costs in this Court expended and damages according to law.

AFFIRMED.